John A. Vogt (State Bar No. 198677)
javogt@jonesday.com
Matthew T. Billeci (State Bar No. 329014)
mbilleci@jonesday.com
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, California 92612.4408
Telephone: +1.949.851.3939
Facsimile: +1.949.553.7539

Attorneys for Defendants
SIMPLISAFE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

TRAVIS SCHLUETER-BECKNER, individually and on behalf of all similarly situated individuals; and ZACH BABKA, individually and on behalf of all similarly situated individuals,

Plaintiffs,

v.

SIMPLISAFE, INC., a Delaware corporation; and DOES 1-10, inclusive,

Defendants.

Case No. 3:25-cv-01764-CRB

**MEMORANDUM OF LAW IN SUPPORT OF SIMPLISAFE, INC.'S MOTION TO COMPEL ARBITRATION**

Date: May 23, 2025
Time: 10:00 a.m.
Place: Courtroom 6

Complaint filed: February 19, 2025

# TABLE OF CONTENTS


Page

INTRODUCTION ..... 1

STATEMENT OF FACTS ..... 2

- I. FACTS PERTAINING TO PLAINTIFF SCHLUETER-BECKNER ..... 2
  - A. Plaintiff Schlueter-Beckner Purchases His Alarm Equipment ..... 2
  - B. Plaintiff Schlueter-Beckner Downloads The SimpliSafe App And Activates His Alarm Monitoring Service ..... 4
- II. FACTS PERTAINING TO PLAINTIFF BABKA ..... 7
  - A. Plaintiff Babka Purchases His Alarm Equipment ..... 7
  - B. Plaintiff Babka Completes Account Set Up For Activation Of His Alarm Monitoring Service ..... 8

LEGAL ARGUMENT ..... 11

- I. THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION ..... 11
  - A. A Valid Agreement To Arbitrate Exists ..... 12
  - B. All Arbitrability Issues Have Been Delegated ..... 16
- II. THE ACTION MUST BE STAYED PENDING ARBITRATION ..... 18

CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page**

**CASES**

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 11

*AT&T Tech, Inc. v. Communications Workers of America*,
475 U.S. 643 (1986) .......... 11, 12

*Berman v. Freedom Fin. Network, LLC*,
30 F.4th 849 (9th Cir. 2022) .......... 12, 15

*Brennan v. Opus Bank*,
796 F.3d 1125 (9th Cir. 2015) .......... 16, 17

*Chiron Corp. v. Ortho Diagnostic Systems, Inc.*,
207 F.3d 1126 (9th Cir. 2000) .......... 12, 17

*Cullors v. Cerebral, Inc.*,
2024 WL 3385530 (9th Cir. July 12, 2024) .......... 13

*Dohrmann v. Intuit, Inc.*,
823 F. App'x 482 (9th Cir. 2020) .......... 13

*Fli-Lo Falcon, LLC v. Amazon.com, Inc.*,
97 F.4th 1190 (9th Cir. 2024) .......... 1, 11, 16

*Flores v. Coinbase, Inc.*,
2023 WL 3564756 (C.D. Cal. Apr. 6, 2023) .......... 16

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) .......... 11

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 63 (2019) .......... 17

*Houtchens v. Google LLC*,
649 F. Supp. 3d 933 (N.D. Cal. 2023) .......... 17

*In re BAM Trading Servs. Inc. Sec. Litig.*,
733 F. Supp. 3d 854 (N.D. Cal. 2024) .......... 17

*Jackson v. Amazon.com, Inc.*,
65 F.4th 1093 (9th Cir. 2023) .......... 17

*Joseph v. Amazon.com Inc.*,
2024 WL 3012499 (N.D. Cal. June 14, 2024) .......... 16

*Keebaugh v. Warner Bros.Entertainment Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......... 13, 14

*Lee v. DoNotPay, Inc.*,
683 F. Supp. 3d 1062 (C.D. Cal. 2023) .......... 13

*Lee v. Ticketmaster, LLC*,
2019 WL 9096442 (N.D. Cal. April 1, 2019) .......... 12

*Morrison v. Yippee Ent., Inc.*,
2024 WL 4647296 (S.D. Cal. Oct. 31, 2024) .......... 15, 16

*Nail v. Lens.com, Inc.*,
2024 WL 3723912 (C.D. Cal. June 20, 2024) .......... 14

*Oberstein v. Live Nation Entertainment, Inc.*,
60 F.4th 505 (9th Cir. 2023) .......... 13, 15

*Patrick v. Running Warehouse, LLC*,
93 F.4th 468 (9th Cir. 2024) .......... 14

*Pizarro v. QuinStreet, Inc.*,
2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) .......... 14

*Ramirez v. Elec. Arts Inc.*,
2021 WL 843184 (N.D. Cal. Mar. 5, 2021) .......... 16, 17

*Shearson/Am. Express v. McMahon*,
482 U.S. 220 (1987) .......... 12

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) .......... 17

*Singh v. Payward, Inc.*,
2023 WL 5420943 (N.D. Cal. Aug. 22, 2023) .......... 17

*Slaten v. Dick's Sporting Goods*,
2024 WL 1136399 (C.D. Cal. Feb. 2, 2024) .......... 17

*Smith v. Spizzirri*,
144 S.Ct. 1173 (2024) .......... 18

*Snow v. Nectar Brand, LLC*,
2023 WL 2558544 (C.D. Cal. Mar. 2, 2023) .......... 14

# **INTRODUCTION**

Plaintiffs allege that SimpliSafe's website contains misleading advertisements that violate California law. SimpliSafe denies these charges. But this Court need not resolve the parties' dispute because this matter belongs in arbitration.

Plaintiffs admit—and SimpliSafe's records confirm—that they each purchased home security systems on SimpliSafe's website, along with alarm service monitoring. To complete the transaction, Plaintiffs selected their alarm system hardware, added the products into their cart, clicked the button to enroll in alarm service monitoring, and then completed the check-out process. After entering the required information into the webform, Plaintiffs clicked the "Place order" button. Adjacent to that button was the following disclosure: "By submitting this order, you agree to SimpliSafe's <u>Terms of Sale</u>, <u>Terms of Service</u> and <u>Privacy Policy</u>." The Terms of Sale and the Terms of Service contain the same arbitration agreement, requiring Plaintiffs to arbitrate before the American Arbitration Association "any dispute or disagreement between the parties . . . , or claim or question by a party, arising from or relating to these Terms of [Sale/Service] or the breach hereof." Both agreements incorporate the AAA Rules, thus delegating arbitrability issues to an arbitrator. *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1199 (9th Cir. 2024) ("incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability.").

After completing their transaction on SimpliSafe's website, both Plaintiffs activated the alarm system monitoring that they added to their cart at the time of their purchase. To complete the activation, Plaintiffs completed a series of electronic forms on the SimpliSafe app or web browser, and re-accepted the Terms of Service and the arbitration agreement contained therein.

Thus, under the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, SimpliSafe respectfully moves for an order compelling this matter to arbitration, as

required under Plaintiffs' written agreements, and staying this action until arbitration has been completed.

## STATEMENT OF FACTS

## I. FACTS PERTAINING TO PLAINTIFF SCHLUETER-BECKNER

### A. Plaintiff Schlueter-Beckner Purchases His Alarm Equipment

On November 16, 2023, Plaintiff Schlueter-Beckner purchased a home security system on SimpliSafe's website. Compl. ¶¶ 108-112; *see also* accompanying Declaration of Jorden Ciruolo ("Ciruolo Decl."), ¶ 2. In order to complete that transaction, Plaintiff Schlueter-Beckner selected alarm system hardware and added it into his shopping cart. Ciruolo Decl., ¶ 2. He also chose to enroll in alarm service monitoring. *Id.* When he was ready to check out, Plaintiff Schlueter-Beckner clicked the "Continue to secure checkout" button in his shopping cart. *Id.*

Plaintiff Schlueter-Beckner was then presented with two webforms to fill out in order to complete the transaction. *Id.*, ¶ 3. The first form required Plaintiff Schlueter-Beckner to enter his personal information—*i.e.*, name, address, phone number, and e-mail address—and select his preferred shipping option. *Id.* After entering this information, Plaintiff Schlueter-Beckner had to click the "Continue to payment" button on the webform to proceed with completing his purchases. *Id.* A true and correct copy of that webform is attached as Exhibit 1 to the Ciruolo Declaration. Plaintiff Schlueter-Beckner would not have been able to complete his transaction unless he completed that form and clicked that button. *Id.*

After clicking the "Continue to payment" button, Plaintiff Schlueter-Beckner was presented with a second webform to complete. *Id.*, ¶ 4. This form required Plaintiff Schlueter-Beckner to select a method of payment and enter his payment information. *Id.* After doing so, Plaintiff Schlueter-Beckner clicked the "Place order" button. *Id.* Immediately adjacent to the "Place Order" button was the following disclosure: "By submitting this order, you agree to SimpliSafe's <u>Terms of</u>

Sale, Terms of Service and Privacy Policy." *Id.* The webform, the disclosure, and the "Place Order" button appeared on a single webpage. A true and correct representation of the webform as it would have appeared when Plaintiff Schlueter-Beckner completed his purchase is attached as Exhibit 2 to the Ciruolo Declaration.

The phrases "Terms of Sale" and "Terms of Service" in the disclosure above was off-set with underlining and, when clicked, presented Plaintiff Schlueter-Beckner with the full text of the agreements. *Id.*, ¶ 5. That is, the phrases "Terms of Sale" and "Terms of Service" in the disclosure were full text hyperlinks to the Terms of Sale and Terms of Service. *Id.* Thus, before clicking the "Place Order" button, Plaintiff Schlueter-Beckner could view the entire text of the Terms of Sale and Terms of Service by clicking on the underlined hyperlinks "Terms of Sale" and "Terms of Service." *Id.* When a consumer clicked on the "Terms of Sale" and/or "Terms of Service" hyperlinks, an additional window would open within the consumer's web browser containing the entire text of the those agreements. *Id.* After entering his information into the second webform, Plaintiff Schlueter-Beckner clicked the "Place order" button, thereby accepting and agreeing to the Terms of Sale and Terms of Service. *Id.* He would not have been able to complete his transaction unless he clicked that button. *Id.* True and correct copies of the Terms of Sale and Terms of Service in effect at the time that Plaintiff Schlueter-Beckner clicked the "Place order" button are attached as Exhibits 3 and 4, respectively, to the Ciruolo Declaration.

The Terms of Sale and Terms of Service to which Plaintiff Schlueter-Beckner agreed contain arbitration agreements. *Id.*, ¶ 6. The arbitration agreements in both contracts require Plaintiff Schlueter-Beckner to resolve "any dispute or disagreement" between himself and SimpliSafe in arbitration before the AAA. *Id.* Both agreements have class action waivers, and incorporate the AAA Rules. *Id.*

### B. Plaintiff Schlueter-Beckner Downloads The SimpliSafe App And Activates His Alarm Monitoring Service

On January 13, 2024, Plaintiff Schlueter-Beckner activated his alarm monitoring service. *See* accompanying Declaration of Scott Von Stein ("Von Stein Decl."), ¶ 2. In order to do so, Plaintiff Schlueter-Beckner downloaded the SimpliSafe mobile app. *Id*. Once downloaded, Plaintiff Schlueter-Beckner had to complete a series of webforms to activate the monitoring service. *Id*. The first form required Plaintiff Schlueter-Beckner to specify the address where the security system would be located. *Id*. A true and correct copy of that form is attached as Exhibit 1 to the Von Stein Declaration. After entering the address information, Plaintiff Schlueter-Beckner then clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id.*

The second form required Plaintiff Schlueter-Beckner to specify the number of occupants at the house that was being monitored. *Id*., ¶ 3. A true and correct copy of that form is attached as Exhibit 2 to the Von Stein Declaration. After entering the occupant information, Plaintiff Schlueter-Beckner must have clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The third form required Plaintiff Schlueter-Beckner to identify a primary contact person at the dwelling being monitored. *Id*., ¶ 4. A true and correct copy of that form is attached as Exhibit 3 to the Von Stein Declaration. After entering that information, Plaintiff Schlueter-Beckner clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The fourth form required Plaintiff Schlueter-Beckner to identify another primary contact person at the dwelling being monitored. *Id*., ¶ 5. A true and correct

copy of that form is attached as Exhibit 4 to the Von Stein Declaration. After entering that information, Plaintiff Schlueter-Beckner must have clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The fifth form required Plaintiff Schlueter-Beckner to identify a secondary contact person at the dwelling being monitored. *Id*., ¶ 6. A true and correct copy of that form is attached as Exhibit 5 to the Von Stein Declaration. After entering that information, Plaintiff Schlueter-Beckner must have clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The sixth form required Plaintiff Schlueter-Beckner to create a safe word. *Id*., ¶ 7. A true and correct copy of that form is attached as Exhibit 6 to the Von Stein Declaration. After entering that information, Plaintiff Schlueter-Beckner must have clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The seventh form required Plaintiff Schlueter-Beckner to confirm his payment information. *Id*., ¶ 8. A true and correct copy of that form is attached as Exhibit 7 to the Von Stein Declaration. After confirming or entering that information, Plaintiff Schlueter-Beckner clicked the "Submit" button on the bottom of the form to proceed to the next step. He would not have been able to activate his alarm monitoring service unless he clicked the "Submit" button.

The final form required Plaintiff Schlueter-Beckner to enter his full name. Immediately above the box to enter his name was the following disclosure:

> **Terms of Service**
>
> Please read SimpliSafe's **Terms of Service** carefully and enter your name below if you accept. By accepting the terms of this agreement, you specifically acknowledge and

> accept: (i) the disclaimer/limitation of liability; (ii) the exclusion of warranties; and (iii) the indemnity paragraphs of this agreement."

*Id.*, ¶ 9. Below the above-quoted disclosure was a box that said: "Agree To Terms." A true and correct copy of that form is attached as Exhibit 8 to the Von Stein Declaration. For the Court's reference, the final form as it would have appeared to Plaintiff Schlueter-Beckner during the alarm activation process that he completed is reproduced below:




The phrase "**Terms of Service**" in the disclosure above was off-set with underlining and bold blue text that, when clicked, would have presented Plaintiff Schlueter-Beckner with the full text of the Terms of Service. *Id.* That is, the phrase "**Terms of Service**" in the disclosure was a full text hyperlink to the Terms of Service. *Id.* Thus, before clicking the "Agree To Terms" button, Plaintiff Schlueter-Beckner could view the entire text of the Terms of Service by clicking on the "**Terms of**

Service" hyperlink. *Id*. When a consumer clicks on the "Terms of Service" hyperlink, an additional window would open within the consumer's browser containing the entire text of the agreement. *Id*. After entering his name into the form, Plaintiff Schlueter-Beckner clicked the "Agree To Terms" button, thereby re-accepting Terms of Service. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked that button. *Id*. A true and correct copy of the Terms of Service in effect at the time that Plaintiff Schlueter-Beckner clicked the "Agree To Terms" button is attached as Exhibit 4 to the Ciruolo Declaration. It is the same Terms of Service, with the same arbitration agreement contained therein, that Plaintiff Schlueter-Beckner agreed to when he purchased his alarm hardware at SimpliSafe's website. *Id*.

## II. FACTS PERTAINING TO PLAINTIFF BABKA

### A. Plaintiff Babka Purchases His Alarm Equipment

On June 7, 2024, Plaintiff Zach Babka purchased a home security system on SimpliSafe's website. Compl., ¶¶ 117-123; *see also* Ciruolo Decl., ¶ 7. In order to do so, Plaintiff Babka completed the same purchase process as Plaintiff Schlueter-Beckner described above. *Id*. Accordingly, after entering the required information into both webforms, Plaintiff Babka clicked the "Place order" button on the second webform, thereby accepting and agreeing to the Terms of Sale and Terms of Service. *Id*. He would not have been able to complete his transaction unless he clicked that button. *Id*. True and correct copies of the webforms that Plaintiff Babka completed to purchase his alarm system hardware are attached as Exhibits 1 and 2 to the Ciruolo Declaration. True and correct copies of the Terms of Sale and Terms of Service in effect at the time that Plaintiff Babka clicked the "Place order" button are attached as Exhibits 5 and 6, respectively, to the Ciruolo Declaration.

The Terms of Sale and Terms of Service to which Plaintiff Babka agreed contain arbitration agreements. *Id*., ¶ 8. The arbitration agreements in both contracts require Plaintiff Babka to resolve "any dispute or disagreement" between himself and

SimpliSafe in arbitration before the AAA. *Id*. Both agreements have class action waivers, and incorporate the AAA Rules. *Id*.

### B. Plaintiff Babka Completes Account Set Up for Activation of His Alarm Monitoring Service

Plaintiff Babka began account set-up for activating his alarm monitoring service the same day that he purchased his alarm system hardware (June 7, 2024). Von Stein Decl., ¶ 10. In order to do so, Plaintiff Babka had to complete a series of webforms to activate the monitoring service. *Id*. The first form required Plaintiff Babka to specify the address where the security system would be located. *Id*. A true and correct copy of that form is attached as Exhibit 9 to the Von Stein Declaration. After entering the address information, Plaintiff Babka then clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to navigate to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The second form required Plaintiff Babka to identify a primary contact person and their phone number at the dwelling being monitored. *Id*., ¶ 11. A true and correct copy of that form is attached as Exhibit 10 to the Von Stein Declaration. After entering that information, Plaintiff Babka clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. Immediately above the "Next" button was the following disclosure: "By submitting this number, you represent that you are authorized to provide this number and agree to the **SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**." *Id*. The phrase "**SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**" was off-set in bold blue text and, if clicked, would have presented the consumer to the full text of SimpliSafe's Terms of Service. *Id*. That is, the phrase "SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts" in the disclosure was a full text hyperlink to the Terms of Service. *Id*. Thus, before clicking the "Next" button, Plaintiff Babka could view the entire text of the Terms of Service by

clicking on the hyperlinked "**SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**." *Id*. When a consumer clicked on the "**SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**" hyperlink, an additional window would open within the SimpliSafe web browser containing the entire text of the that agreement. *Id*. As noted, after entering information to identify the primary contact, Plaintiff Babka must have clicked the "Next" button, thereby re-accepting and re-agreeing to the Terms of Service. *Id*. He would not have been able to navigate to the next form and activate his alarm monitoring service unless he clicked the "Next" button. *Id*. A true and correct copy of the Terms of Service in effect at the time that Plaintiff Babka clicked the "Next" button is attached as Exhibit 6 to the Ciruolo Declaration. It is the same Terms of Service, with the same arbitration agreement, that Plaintiff Babka agreed to when he purchased his alarm hardware at SimpliSafe's website. *Id*.

The third form required Plaintiff Babka to identify another primary contact person and their phone number at the dwelling being monitored. *Id*., ¶ 12. A true and correct copy of that form is attached as Exhibit 11 to the Von Stein Declaration. After entering that information, Plaintiff Babka clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. Immediately above the "Next" button was the following disclosure: "By submitting this number, you represent that you are authorized to provide this number and agree to the **SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**." *Id*. The phrase "**SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**" was off-set in bold blue text and, if clicked, would have presented the consumer to the full text of SimpliSafe's Terms of Service. *Id*. That is, the phrase "SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts" in the disclosure was a full text hyperlink to the Terms of Service. *Id*. Thus, before clicking the "Next" button, Plaintiff Babka could view the entire text of the Terms of Service by clicking on the hyperlinked "**SimpliSafe Terms and Consent to Communicate, for**

**Notifications and Alerts**." *Id*. When a consumer clicked on the "**SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**" hyperlink, an additional window would open within the SimpliSafe web browser containing the entire text of the that agreement. *Id*. As noted, after entering information to identify the primary contact, Plaintiff Babka then clicked the "Next" button, thereby re-accepting and re-agreeing to the Terms of Service. *Id*. He would not have been able to navigate to the next form and activate his alarm monitoring service unless he clicked the "Next" button. *Id*. A true and correct copy of the Terms of Service in effect at the time that Plaintiff Babka clicked the "Next" button is attached as Exhibit 6 to the Ciruolo Declaration. It is the same Terms of Service, with the same arbitration agreement, that Plaintiff Babka agreed to when he purchased his alarm hardware at SimpliSafe's website. *Id*.

The fourth form required Plaintiff Babka to create a safe word. *Id*., ¶ 13. A true and correct copy of that form is attached as Exhibit 12 to the Von Stein Declaration. After entering that information, Plaintiff Babka then clicked the "Next" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to activate his alarm monitoring service unless he clicked the "Next" button. *Id*.

The fifth form required Plaintiff Babka to save his payment information. *Id*., ¶ 14. A true and correct copy of that form is attached as Exhibit 13 to the Von Stein Declaration. After entering that information, Plaintiff Babka then clicked the "Save Card" button on the bottom of the form to proceed to the next step. *Id*. He would not have been able to navigate to activate his alarm monitoring service unless he clicked the "Save Card" button. *Id*.

The final form required Plaintiff Babka to create an account, which included entering a username and password. *Id*., ¶ 15. A true and correct copy of that form is attached as Exhibit 14 to the Von Stein Declaration. After entering that information, Plaintiff Babka clicked the "Finish Setup" button on the bottom of the form to

proceed to the next step. *Id*. He would not have been able to navigate to the next form and activate his alarm monitoring service unless he clicked the "Finish Setup button. *Id*. After completing the final form, Plaintiff Babka arrived the final screen him that informed he had completed the set up. *Id*. A true and correct copy of that form is attached as Exhibit 15 to the Von Stein Declaration.

## LEGAL ARGUMENT

### I. THE COURT SHOULD COMPEL THIS MATTER TO ARBITRATION

Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted).

Pursuant to the FAA, arbitration must be compelled where, as here: (1) a valid agreement to arbitrate exists; and (2) the arbitration agreement encompasses the claims at issue. *See Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). With respect to the first question, an arbitration agreement governed by the FAA is presumed to be valid and enforceable. *Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987). There is a presumption in favor of arbitrability, *AT&T Techs, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986), and the party seeking to evade arbitration bears the burden of showing that the arbitration provision is invalid or does not encompass the claims at issue. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 92 (2000). With respect to the second question, courts normally address that gateway question of arbitrability, but the parties may "clear[ly] and unmistakab[ly]" delegate it to the arbitrator for resolution in the first instance. *Fli-Lo Falcon*, 97 F.4th at 1199 (internal quotation marks and

citations omitted). In answering that question, "there is a presumption of arbitrability": "'An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Techs.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582–83 (1960)).

**A. <u>A Valid Agreement To Arbitrate Exists</u>**

Courts within this Circuit routinely enforce internet agreements where the user is required to affirmatively acknowledge the agreement before proceeding with use of the website. *See*, *e.g.*, *Lee v. Ticketmaster, LLC*, 2019 WL 9096442, at *1 (N.D. Cal. April 1, 2019), *aff'd* 817 Fed. Appx. 393 (9th Cir. 2020) ("Ticketmaster provided notice of the terms of use adjacent to the 'Place Order' button, included a hyperlink to the terms in a contrasting color, and informed the user that 'continuing past this page' (*i.e.*, placing an order) would indicate assent to the terms."); *see also*, *e.g., Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022) (a contract exists where "the website provides reasonably conspicuous notice of the terms to which the consumer will be bound" and "the consumer takes some action … that unambiguously manifests his or her assent").

As a matter of law, Plaintiffs agreed to the Terms of Sale and Terms of Service when completing their purchases because: (1) they had clear notice of the Terms of Sale and Terms of Service at the time they completed their purchases; (2) they were admonished that, by clicking an adjacent button, they were agreeing to be bound by the Terms of Service; and (3) they clicked the button, thereby manifesting their assent to the Terms of Service. Plaintiffs also re-accepted the Terms of Service during their respective alarm activation processes by clicking a button immediately below a disclosure that admonished that, by taking such action, they were agreeing to the Terms of Service.

*Oberstein v. Live Nation Entertainment, Inc.*, 60 F.4th 505 (9th Cir. 2023) is instructive. There, the "action button[s]" on Ticketmaster's website were located "directly above or below" text informing users that "[b]y continuing past this page and clicking [the button], [they] agree[d] to [its] Terms of Use." *Id*. at 515–16 (some alterations in original). The website also allowed users to access those Terms of Use through a hyperlink signified by the "bright blue font" that "distinguish[ed]" the phrase "Terms of Use" "from the surrounding text." *Id.* at 516. The Ninth Circuit upheld the district court's conclusion "that a reasonable user would have seen the notice and been able to locate the Terms via hyperlink." *Id.* As a result, those who clicked to complete their purchase were bound by those Terms of Use, including the arbitration clause within them. *Id.*

Other courts in this Circuit have ruled in the same manner. In *Keebaugh v. Warner Bros. Entertainment Inc.*, 100 F.4th 1005 (9th Cir. 2024), for example, the Ninth Circuit reversed the denial of Warner Brothers' motion to compel arbitration because the login screens for its mobile app Game of Thrones Conquest instructed users—in white text on black background, above boxed text linking to the relevant documents—that "[b]y tapping 'Play' [they] agree to the Terms of Service." *Id*. at 1010–11, 1019–23. And in *Cullors v. Cerebral, Inc.*, 2024 WL 3385530 (9th Cir. July 12, 2024), the Ninth Circuit affirmed an order compelling arbitration where the website "presented [users] with a purple button with white text that read 'Get started'" located "directly" above text that read "By clicking 'Get started,' you agree to Cerebral's [hyperlinked] Terms & Conditions." *Id*. at *1. Many more cases follow suit. *See, e.g.*, *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 (9th Cir. 2020) ("Sign In" button directly above text stating "*By clicking Sign In, you agree to the [hyperlinked] Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement.*"); *Lee v. DoNotPay, Inc.*, 683 F. Supp. 3d 1062, 1067 (C.D. Cal. 2023) (purple "Continue" button above text that said "By signing up or signing in, you are agreeing to DoNotPay's Terms and Conditions and

for us to send messages to the phone number or email provided"); *Nail v. Lens.com, Inc.*, 2024 WL 3723912, at *3 (C.D. Cal. June 20, 2024) (red "Continue" button above text indicating that "By continuing you agree to our Terms of Use & Privacy Policy").

Under this authority, Plaintiffs accepted SimpliSafe's Terms of Sale and Terms of Service. To make their purchases on SimpliSafe's website, they clicked a "Place order" button. Immediately adjacent to that button, in text that was offset through underlining, SimpliSafe notified them that, "[b]y submitting this order, you agree to SimpliSafe's Terms of Sale, Terms of Service and Privacy Policy." "That the links are not blue, underlined, or capitalized does not undercut the district court's conclusion that [Defendant] provided [Plaintiff] with 'reasonably conspicuous notice' of the Terms." *See Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 477 (9th Cir. 2024); *Nail*, 2024 WL 3723912, at *4 (same); *Pizarro v. QuinStreet, Inc.*, 2022 WL 3357838 (N.D. Cal. Aug. 15, 2022) (finding the Terms of Use placed in grey text and an underlined hyperlink immediately below "See My Rates" button conspicuous because the "hyperlink, although the same color as the rest of the textual notice, is underlined and adequately contrasted with the white background"); *Snow v. Nectar Brand, LLC*, 2023 WL 2558544, *2 (C.D. Cal. Mar. 2, 2023) (finding the Terms and Conditions conspicuous when placed in grey text and an underlined hyperlink with a white background immediately beneath "Place Order" button). Both Plaintiffs clicked the "Place order" button, thereby accepting and agreeing to the Terms of Sale and Terms of Service, including the arbitration agreements contained therein.

Cementing this conclusion is that courts also consider the context of the transaction when assessing whether the parties contemplate a continuing relationship that would make the consumer more likely to scrutinize the webpage for an agreement. *Keebaugh*, 100 F.4th at 1019 ("[T]he transactional context is an important factor to consider and is key to determining the expectations of a typical

consumer."); *see also Oberstein*, 60 F.4th at 516 (same). Courts are more likely to enforce hyperlinked agreements with transactions that contemplate a continuing relationship. *Keebaugh*, 100 F.4th at 1020*; see also Morrison v. Yippee Ent., Inc.*, 2024 WL 4647296 (S.D. Cal. Oct. 31, 2024) (stating the same).

Continuing relationships have been found where consumers sign up for a service that is ongoing and contemplates repeat visits from the consumer such as, for example, when a website requires "a full registration process" to purchase tickets (*Oberstein*), or when a user downloads a mobile-game with potentially unlimited in-app purchases (*Keebaugh*). The context of the transactions at issue here contemplate an ongoing relationship. Plaintiffs purchased alarm systems that would be managed by SimpliSafe. And also signed up for on-going alarm system monitoring as part of their alarm system transaction. *Keebaugh*, 100 F.4th at 1019; *see also Morrison*, 2024 WL 4647296, at *4 ("[S]ubscription-based model implies that a user must act to renew their subscription to continue their use when their original subscription expires (or, in the case of automatic renewal, to cancel their subscription when no longer wanted), and thus represents a more continuing, interactive, relationship than making a one-time purchase.").

Regardless, in order to activate their alarm system monitoring, Plaintiffs re-accepted the Terms of Service, including the arbitration agreement contained therein. As for Plaintiff Schuelter-Beckner, he re-accepted the Terms of Service by clicking the "Agree To Terms" button located below the following disclosure: "Please read SimpliSafe's **Terms of Service** carefully and enter your name below if you accept. By accepting the terms of this agreement, you specifically acknowledge and accept: (i) the disclaimer/limitation of liability; (ii) the exclusion of warranties; and (iii) the indemnity paragraphs of this agreement." Plaintiff Schuelter-Beckner clicked the "Agree To Terms" button, and re-accepted the Terms of Service. *Id*. As noted, he could not have activated his alarm system monitoring service unless he clicked the "Agree To Terms" button. He is thus bound. *Berman*, 30 F.4th at 856 ("The most

straightforward application of these principles in the online world involves so-called 'clickwrap' agreements, in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed.").

Plaintiff Babka also re-accepted the Terms of Service when he activated his alarm system monitoring. As noted, he was admonished, immediately above the "Next" button, that by clicking that button to submit the name of a contact person and their phone number, he was agreeing to the Terms of Service: "By submitting this number, you present that you are authorized to provide this number and agree to the **SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts**." Plaintiff Babka clicked the "Next" button, and re-accepted the Terms of Service, including the arbitration agreement contained therein.

### B. All Arbitrability Issues Have Been Delegated

"Arbitration clauses may delegate to the arbitrator . . . certain threshold issues about the agreement"—such as "whether [the arbitration] agreement covers a particular controversy"—so long as they do so "clear[ly] and unmistakabl[y]." *Fli-Lo Falcon*, 97 F.4th at 1199 (internal quotation marks and citations omitted, initial alteration in original). One way to do so is by incorporating arbitral rules that authorize arbitrators to resolve such questions into their agreement.

The AAA Rules—which both the Terms of Sale and Terms of Service expressly incorporate—give an arbitrator power "to rule on his or her own jurisdiction, including any objections with respect to the . . . scope . . . of the arbitration agreement." AAA Consumer Arbitration Rule 14(a). The Ninth Circuit has held that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." *Fli-Lo Falcon*, 97 F.4th at 1199 (quoting *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015)); *Flores v. Coinbase, Inc.*, 2023 WL 3564756 (C.D. Cal. Apr. 6, 2023); *Joseph v. Amazon.com Inc.*, 2024 WL 3012499, *3 (N.D. Cal. June 14, 2024); *Ramirez v. Elec.*

*Arts Inc.*, 2021 WL 843184, *4 (N.D. Cal. Mar. 5, 2021); *Houtchens v. Google LLC*, 649 F. Supp. 3d 933, 944-45(N.D. Cal. 2023); *see also Slaten v. Dick's Sporting Goods, Inc.*, 2024 WL 1136399, at *5 (C.D. Cal. Feb. 2, 2024) (holding same where JAMS Streamlined Arbitration Rules & Procedures are incorporated).

This Court has agreed, finding that *Brennan* supports that the "incorporation of the AAA or JAMS rules is sufficient for a court to find intent to delegate arbitrability, regardless of the parties' sophistication." *Singh v. Payward, Inc.*, 2023 WL 5420943, *7-8 (N.D. Cal. Aug. 22, 2023) (Breyer, J.) (collecting cases); *see also In re BAM Trading Servs. Inc. Sec. Litig.*, 733 F. Supp. 3d 854 (N.D. Cal. 2024) (holding same). Thus, by virtue of the agreements' incorporation of the AAA Rules, all arbitrability issues have been delegated to an arbitrator. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019).

Regardless, the claims are arbitrable. The arbitration agreement in the Terms of Sale and Terms of Service provides that "Disputes" between the parties shall be "finally settled by arbitration administered by the American Arbitration Association in accordance with the provisions of its Consumer Arbitration Rules." The arbitration agreement broadly defines "Disputes" as "any dispute or disagreement between the parties, or claim or question by a party, arising from or relating to these Terms of Sale or the breach hereof." As the Ninth Circuit has explained, language that submits all disputes arising out of or relating to the parties' agreement to the arbitrator is "broad and far reaching," *see Chiron Corp*, 207 F.3d at 1131, and "embraces every dispute between the parties having a significant relationship to the contract regardless of the label attached to the dispute." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999) (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 321 (4th Cir. 1988)). So long as the plaintiff's claims "touch matters covered by the contract," the plaintiff must arbitrate. *Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1101 (9th Cir. 2023) (internal quotation marks and citation omitted).

Unquestionably, Plaintiffs' claims—which center on SimpliSafe's allegedly misleading and/or deceptive advertisements on its websites in connection with the purchase of alarm system hardware and the cancellation process for SimpiSafe's alarm monitoring services—"aris[e] out of or relate[] to" the Terms of Sale and Terms of Service.

## II. THE ACTION MUST BE STAYED PENDING ARBITRATION

Section 3 of the FAA expressly provides that a district court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; *Smith v. Spizzirri*, 144 S.Ct. 1173, 1175 (2024) ("The question here is whether § 3 permits a court to dismiss the case instead of issuing a stay when the dispute is subject to arbitration and a party requests a stay pending arbitration. It does not.").

## CONCLUSION

The Motion to Compel Arbitration should be granted.

Dated: April 17, 2025

JONES DAY

By: [signature]
John A. Vogt

Attorneys for Defendant
SimpliSafe, Inc.