1  Elliot J. Siegel (Bar No. 286798)
2  elliot@kingsiegel.com
   Julian Burns King (Bar No. 298617)
3  julian@kingsiegel.com
   Brent R. Boos (Bar No. 292808)
4  brent@kingsiegel.com
5  **KING & SIEGEL LLP**
   724 South Spring Street, Suite 201
6  Los Angeles, California 90014
7  tel:  (213) 465-4802
   fax: (213) 465-4803
8
9  Attorneys for Plaintiffs and Putative Class

10             **UNITED STATES DISTRICT COURT**

11          **NORTHERN DISTRICT OF CALIFORNIA**

12

13  **Travis Schlueter-Beckner,**          CASE NO. <u>3:25-cv-01764-CRB</u>
14  individually and on behalf of all
    similarly situated individuals; and     **FIRST AMENDED CLASS ACTION**
15  **Zach Babka**, individually and on      **COMPLAINT FOR:**
16  behalf of all similarly situated
    individuals,                            **1) Violation of California's False**
17                                              **Advertising Law (Bus. & Prof.**
                   Plaintiffs,                 **Code §§ 17500, et seq.);**
18                                          **2) Violation of California's**
19             vs.                             **Consumer Legal Remedies Act**
                                               **(Cal. Civ. Code §§ 1750, et seq.);**
20                                              **and**
    **SimpliSafe, Inc.**, a Delaware       **3) Violation of California's Unfair**
21  corporation; and **Does 1-10**,           **Competition Law (Bus. & Prof.**
22  inclusive;                                 **Code §§ 17200, et seq.)**
23                 Defendants.
                                            **Demand for Jury Trial**
24
25
26
27
28

---

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Travis Schlueter-Beckner and Zach Babka, by and through their counsel of record, bring this action on behalf of themselves and all other similarly situated consumers and allege as follows:

## **INTRODUCTION**

1.      The temptation to advertise fake discounts is significant for retailers, whose profits can be increased by simply claiming that their products, or "similar" products, regularly sell for more than they really do.

2.      Defendant provides a textbook example of this illegal use of fake or permanent discounts to trick consumers into purchasing its wares. These illusory discounts are anti-consumer, anti-competitive, and place profits above the law.

3.      By advertising discounts off higher reference prices, Defendant is able increase the perceived value of products to consumers and decrease their desire to search for competing products, making them more likely to buy the retailer's products.

4.      Further, by representing that discounts are temporary, Defendant is able to increase a consumer's sense of urgency to buy the product now rather than later or risk losing the discount.

5.      While offering legitimate discounts to achieve these results is a valid form of competition, offering fake ones—with fictitious "reference prices" and/or expiration dates—is deceptive, illegal, and harmful to consumers.[1]

6.      "[R]eference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product."[2]

---

[1] Reference pricing is an advertising technique where retailers display a product's current, typically discounted, price next to a higher, regularly offered price for that product. That higher, regularly offered price is known as the "Reference Price."

[2] *See* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An investigation into the effects*

7. Empirical research indicates that "[i]nflated reference prices can [...] increase consumers' value perceptions [...], reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products."[3]

8. Indeed, research "suggest[s] that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price."[4] One study showed that "on average, consumers were willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay $250.80 for the identical product with a $429.00 reference price."[5]

9. To combat such deceptive and unfair practices, California's False Advertising Law ("FAL") prohibits businesses from making statements that they know or should know to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. This includes a prohibition on advertisements stating or suggesting that a product is discounted when, in fact, it is not.

10. The FAL considers a sale to be fake—and illegal—when it continues for a period of more than 3 months, *i.e.*, a permanent sale.[6]

11. Similarly, California's Consumer Legal Remedies Act ("CLRA")

---

*of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, J. of Applied Bus. Research 6, no. 1, pp. 65-66 (1990); *see also* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118 (1994) ("reference to a retailer's normal or regular price in retail sale prices advertising provides the consumer with information used to determine perceived value").

[3] Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

[4] *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, *supra*, at p. 66.

[5] *Id.*

[6] Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price [. . .] unless the alleged former price was the prevailing market price [. . .] within three months next immediately preceding the publication of the advertisement.").

FIRST AMENDED CLASS ACTION COMPLAINT

prohibits "advertising goods or services with the intent not to sell them as adver-
tised" and specifically prohibits, among other things, "false or misleading state-
ments of fact concerning reasons for, existence of, or amounts of price reductions."
Cal. Civ. Code § 1770(a)(9), (13).

12.    Defendant's violations of these laws must cease.

**PARTIES**

13.    Plaintiff **Travis Schlueter-Beckner** is and was at relevant times
domiciled in San Francisco, California, and during that time purchased qualifying
products from Defendant.

14.    Plaintiff **Zach Babka** is and was at relevant times domiciled in Ala-
meda, California, and during that time purchased qualifying products from De-
fendant.

15.    The proposed Class includes both current California residents and for-
mer residents who were domiciled in California when they purchased one or more
qualifying products from SimpliSafe, Inc. while being advertised with false or mis-
leading discounts.

16.    Defendant **SimpliSafe, Inc.** ("SimpliSafe" or "Defendant") is a Dela-
ware corporation with its principal place of business located at: 100 Summer
Street, Suite 300, Boston, MA 02110. SimpliSafe is a company that provides home
security systems designed to be affordable, flexible, and easy to install. Founded in
2006, SimpliSafe has become a popular choice for homeowners and renters who
want a security solution without the need for professional installation or long-term
contracts.

17.    Plaintiffs are not currently aware of the names and true identities of
Does 1-10. Plaintiffs reserve the right to amend this complaint to allege their true
names and capacities when this information becomes available. Each Doe defend-
ant is responsible for the damages alleged pursuant to each of the causes of action
asserted, either through its own conduct or vicariously through the conduct of

others. All further references in this complaint to any of the named Defendants include the fictitiously named Doe defendants.

18.    At all times alleged herein, each Defendant was an agent, servant, joint employer, employee, partner, and/or joint venture of every other Defendant and acted within the scope of their relationship with the others. Moreover, the conduct of every Defendant was ratified by each other Defendant.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed Class are citizens of a state different from that of Defendant.

20.    This Court has personal jurisdiction over Defendant. Defendant does business in California. It advertises and sells its products in California to a market of consumers there. Due to Defendant's actions, its products have been marketed and sold to consumers in California and have harmed consumers in California. Plaintiffs' claims likewise arose out of Defendant's contacts with this forum. Due to Defendant's actions, Plaintiffs purchased Defendant's product in California and were harmed in California.

21.    Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendant would be subject to personal jurisdiction in this District if this District were a separate state. Defendant advertises and sells its products to consumers in this District, serves a market for its products in this District, and the claims of at least one Plaintiff arose out of Defendant's contacts in this forum. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here.

**FACTUAL ALLEGATIONS**

***SimpliSafe Advertises Sales with False***
***and Misleading "Discounts"***

22.   Defendant SimpliSafe, Inc. ("SimpliSafe" or "Defendant") advertises, markets, and sells home security systems, including a variety of devices designed to protect homes and properties (the "Products") directly to consumers, who are largely comprised of homeowners, renters, business owners, and other security-conscious individuals.

23.   Its Products are Security Systems and the individual components they are comprised of, including Base Stations, Keypads, Entry Sensors, Motion Sensors, Security Cameras, Panic Buttons, Environmental Sensors, Smart Locks, Smart Home Integration, and 24/7 Professional Monitoring among other things.

24.   The Products are all privately branded (i.e., SimpliSafe products) and primarily sold by SimpliSafe. A limited number of Simplisafe's Products are also sold by third-party resellers.

25.   To that end, Defendant maintains a public website where it advertises and sells its Products: https://simplisafe.com. Consumers can purchase the Products through a webstore hosted on Defendant's website.

26.   Like many businesses, SimpliSafe advertises "discounts" or "sales," during which the prices for its Products are purportedly reduced from higher prices that are represented to be former or regular prices (i.e., "Reference Prices"). These sales come in a couple of different flavors, including site-wide sales, as well as a permanent discount applied when a customer purchases a "new system."

27.   A "new system," as defined by SimpliSafe, is any purchase that includes a Base Station, which is the electronic hub for their security system that can *only* be purchased as part of a new system, and all new systems must include one (1)

Base Station and at least one (1) Keypad.[7]

28.    Consumers buy Products from Defendant as part of a new system in one of two ways through its website. The first is through Defendant's "Shop Packages" page, where it advertises and sells several preconfigured packages—each including at least one Base Station and Keypad. The second is through Defendant's "Build My System" page, where customers can pick and choose Products to add to a system for purchase on top of the required Base Station and Keypad.[8]

29.    In this case, Defendant does not advertise that customers will receive a discount on Products if and when they purchase a bundle of Products. Rather, Defendant *continuously* advertises that all new system Product bundles are *temporarily* discounted from their regular prices if purchased during a limited-time sale with an imminent expiration date prominently displayed on its website.

30.    However, the Reference Prices Defendant advertises are not bona fide former prices, prevailing market prices, comparison prices, or true market values, rendering its "sales" and advertised "discounts" illusory in all respects.

31.    Further, Defendant falsely represents that its sales are time-limited to instill a sense of urgency in potential customers to buy the Products now or risk losing the advertised "discount."

32.    In reality, Defendant's Products are *always* advertised with discounts off higher Reference Prices when purchased as part of a new system, and the vast

---

[7] SimpliSafe's website describes the Base Station as: "The brains of the system. Built with a backup battery in case of a power outage. Just plug it in to start protecting."

[8] Defendant's practices are similar to but distinct from what is referred to in Federal Trade Commission ("FTC") regulations as "bargain offers based upon the purchase of other merchandise." "Frequently, advertisers choose to offer bargains in the form of additional merchandise to be given a customer on the condition that he purchase a particular article at the price usually offered by the advertiser." 16 C.F.R. § 233.4. "It is important, therefore, that where such a form of offer is used, care be taken not to mislead the consumer." *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

majority of the Products are sold as part of a new system, so customers rarely, if ever, pay the purported References Prices.

33. In other words, the "discounted" prices *are* Defendant's regular prices—its Reference Prices are fictitious ones used solely to induce potential customers into purchasing its Products and paying higher prices for them.

34. This practice is known as false reference pricing. False reference pricing occurs when a seller advertises an artificial, inflated price for the sole purpose of enabling the subsequent offer of a large reduction from that price. In such cases, the "reduced" price is, in reality, just the seller's regular price and the "bargain" being advertised is a false one where the purchaser is not receiving the value he or she expects from the purchase.

35. At all times on its website, Defendant advertises a sale featuring a significant "discount" on *all* Products purchased as part of a new system. Defendant communicates this in at least five distinct ways:

36. *First*, Defendant continuously advertises sitewide sales on a banner at the top of its website (while slightly varying the discount being offered).

37. Along with purported discounts, Defendant represents that these sales are time-limited by including language such as "ENDS TUESDAY," "ENDS TOMORROW," and "ENDS MIDNIGHT," indicating that customers will lose out on the discounts if they wait any longer to make purchases. Sometimes, Defendant also includes a timer counting down to zero in its sales banners to drive home the sense of urgency in its potential customers. Example screen captures of Defendant's sales banners are provided below:



38.     In reality, Defendant's sales never end. For example, on October 15, 2024, Defendant advertised a sale of "50% off +FREE INDOOR CAMERA," which was advertised as ending at midnight. But the next day, on October 16, 2024, Defendant advertised a sale of "50% OFF + FREE $100 VISA GIFT CARD," which was represented to "END[] TUESDAY." However, the next Wednesday, October 23, 2024, Defendant simply returned to its previous sale: "50% off + FREE INDOOR CAMERA" — "ENDS TUESDAY."[9] Example screen captures of Defendant's sales banners are provided below:



---

[9] In significantly smaller and all lowercase text below each advertisement, Defendant appended "on any new system with professional monitoring."

1

2

3

4

5

6



7    39.    On information and belief, this practice has resulted in *all* Products, at

8  all times throughout the relevant period, being advertised as "discounted"—for a

9  limited time only—when purchased as part of a new system.

10    40.    *Second*, Defendant offers a permanent discount on all its "prepack-

11  aged" deals. Defendant's "Shop Packages" page advertises and sells several precon-

12  figured packages including anywhere from 4 to 14 separate components.

13    41.    Each preconfigured package includes a Base Station, Keypad, Entry

14  Sensor, and Motion Sensor, and is advertised with: (1) a flavorful name for the

15  package (e.g., "The Beacon"); (2) a percentage discount (e.g., "20% OFF"); and (3)

16  a "discounted" price expressed in both monthly installments if paid over 24

17  months, and a total price if paid upfront, listed in red text next to a purported Ref-

18  erence Price that is struck-out (e.g., "$12.17/mo $30.41/mo"; "$292.00 $729.90").

19

20

21

22




23

24

25

26

27

28

9

42.    Each package also has a "See details" button, which, if clicked on, takes potential customers to another webpage with more information about that package and relists the same percentage discount, a monthly price in red text next to a struck-out Reference Price in black text, and a total price in red text next to a struck-out Reference Price in black text. At the time of filing, this page also states, "You're saving 60% today and getting **1 free month of Pro Monitoring**." Based on Plaintiffs' counsel's investigation, this page has, at various times, further stated that customers will receive "1 FREE Smart Alarm Wireless Indoor Security Camera" or "1 FREE $100 Visa Gift Card."[10]

43.    Despite being advertised with higher Reference Prices, these preconfigured packages are never sold at those prices but are *always* sold at a lower discounted price.

44.    *Third*, Defendant runs a similar scheme with respect to "custom" new system packages. On Defendant's "Build My System" page, customers can customize a new security system for purchase. Regardless of which additional components customers add to their system, this webpage, each custom-built system automatically includes one (1) Base Station and one (1) Keypad, which cannot be removed. Any number of other Products can be added to the system for purchase.

45.    Toward the bottom of this page, Defendant lists Reference Prices for the Base Station, which are expressed as monthly payments over 24 months (e.g., "1 Base Station—$5.42/mo" and "1 Keypad—$2.92/mo"), as well as for all other Products added to the system. Any other Products added to a custom package are similarly identified with Reference Prices expressed as monthly payments.

46.    Below this information, Defendant displays "discounted" prices for the

---

[10] Based on Plaintiffs' counsel's investigation, this page continuously updates to display whatever "free" item and percentage discount Defendant happens to be advertising that week.

entire system, expressed in monthly installments and in full, are listed in red text next to a purported Reference Price in black text that is struck out. An example screen capture is provided below:



47.    Lastly, this webpage states at the time of filing, "You're saving 60% today and getting **1 free month of Core Monitoring**." Based on Plaintiff's counsel's investigation, this webpage sometimes also shows "1 Smart Alarm Wireless Indoor Security Camera" identified as "Free," or a "$100 Visa Gift Card" identified as "Free."

48.    Despite being advertised with higher References Prices, these custom packages also are never sold at those prices but are always sold at a lower discount.

49.    *Fourth*, Defendant again advertises the "discount" customers are getting before purchase. Defendant's "Shop Packages" and "Build My System" web pages both include an "Add to cart" button. After a potential customer clicks this button, they are taken to an online shopping cart wherein the previously selected Products have been placed for purchase.

50.    If a customer adds a preconfigured new system package to their cart, then it will list the name of the package, a Reference Price for the package, and—below that—each item included in the package.

51.    If a customer adds a custom new system package to their cart, it will list each item included in the package and a total Reference Price for all those items.

52.    In addition to listing each Product placed in their cart, this webpage states, at the time of filing, that customers will receive "1x Pro Monitoring" for "$0.00." At other times, this page has shown "1x Smart Alarm Wireless Indoor Security Camera" for "~~$149.99~~ Free" or, on information and belief, "1x $100 Visa Gift Card" for "~~$100~~ Free."

53.    These "free" items are automatically included in customers' carts unless deliberately removed by them. Below this, Defendant lists a coupon code being applied (e.g., "SIMPLI60SAEF") and the total savings customers will purportedly receive in red text (e.g., "-$437.90").[11] This coupon code is automatically applied to items in the customer's cart. An example screen capture is provided below:

---

[11] The total purported savings listed in customers' carts is comprised of all purported discounts on Products and the purported value of "free" items.

## Your Shopping Cart:

Continue shopping    **Secure checkout**

- 1 + **The Beacon** $729.90 ⊗

|  |  |
|---|---|
| 1 Base Station | 2 Outdoor Camera |
| 1 Keypad | 2 Outdoor Camera Power Cable |
| 2 Motion Sensor Gen 2 | 2 Window Decals |
| 4 Entry Sensor | 1 Home Security Yard Sign |

1x **Pro Monitoring** $0.00 ⊗

Your purchase comes with a free month of Pro Monitoring! You can activate your trial and subscribe to Pro Monitoring when you set up your device within the SimpliSafe app or online. After your one-month trial, you'll be charged $49.99 per month unless you cancel. No long-term contracts — call to cancel any time.

Change plan

**Coupon code applied** -$437.90
SIMPLI60SAFE

Change code

**Free shipping (5-7 business days)** $0.00
You may select a different shipping method at checkout.

## Subtotal

| **Pay as low as** | $12.17/mo ~~$30.41/mo~~ | **Or pay in full** | $292.00 ~~$729.90~~ |
|---|---|---|---|
| on equipment for 24 mos. At checkout, pay over time with affirm ⓘ | | due today | |

54. *Fifth*, when a customer clicks the "Secure checkout" box, they are directed to a checkout page with an order summary listing the subtotal for all Products and the total savings customers will purportedly receive in red text (e.g., "Coupon code applied: -$437.90"). An example screen capture is provided below:

FIRST AMENDED CLASS ACTION COMPLAINT

**Order summary**

| Review cart | ∧ |
|---|---|
| 1x  The Beacon | $729.90 |
| 1x  Pro Monitoring | $0.00 |
| | |
| Subtotal: | $729.90 |
| Coupon code applied: | -$437.90 |
| Shipping: | $0.00 |
| Estimated tax: | $0.00 |
| **Total:** | **$292.00** |

55.     In all five scenarios, the Reference Prices listed and struck out on Defendant's webpages could only reasonably be understood by consumers to represent prices formerly and regularly charged for new system Products, and that the sale being advertised offered a temporary discount off of those prices.

56.     Defendant knew and counted on the fact that reasonable consumers interpreted its sales advertisements to mean that it formerly and regularly charged the full Reference Prices for its Products, including when purchased as part of a new system, and that they would receive a substantial discount off those prices (plus a free indoor camera or $100 Visa gift card) if they purchased the Products before the sale's advertised expiration date.

57.     Defendant also knew and counted on the fact that reasonable consumers would reasonably interpret these advertisements to mean that Defendant would charge the full Reference Prices for its new system Products again, once the sale's advertised expiration date passed, so if they waited too long to make their purchases they would miss out on the advertised "discounts."

58.     In reality, Defendant's sales *never* end, and its new system Products are *never* sold at their Reference Prices, so the advertised "sales" and "discounts" were just illusions.

### *Plaintiffs' Counsel's Investigation*

59.    To confirm that SimpliSafe perpetually advertises "limited time" discounts on new system Products that are—in fact—permanently discounted, Plaintiffs' counsel recorded screenshots of Defendant's website on a near-daily basis from October 4, 2024, to February 3, 2025 (120 of 123 days). For 100% of those days, Defendant's website displayed a banner advertising a purportedly limited-time sale offering at least 20% off "on any new system with professional monitoring," but usually 50-60% off. These sales typically also advertised the inclusion of a free indoor camera or a free $100 Visa gift card.

60.    On information and belief, this has also been true of Defendant's sales advertisements going backward in time for all or most of the Class period.

### *SimpliSafe's Reference Prices Are Not Prevailing Market Prices*

61.    Defendant is the apparent manufacturer or owner of its privately branded Products. On information and belief the vast majority of its Products are sold directly to consumers through its own website.

62.    While Defendant offers to sell most—but not all—of the Products individually, those Products can only be used in conjunction with a preexisting SimpliSafe security system containing a Base Station. The Base Station, or "brain of the system," can *only* be purchased as part of a new system. Thus, all SimpliSafe customers must first purchase Defendant's Products as part of a new system. As such, the vast majority of its Products are sold as part of a new system at purportedly discounted prices, and the Base Station is *only* sold at purportedly discounted prices.

63.    On information and belief, because Defendant is the manufacturer and/or owner of its privately branded Products, it is also the primary seller of the Products and sets prevailing market prices for the Products.

64.    Further, on information and belief, the vast majority of the Products sold by Defendant are sold as part of a new system because each customer *must*

purchase a new system first to have a functioning security system (given that they need a Base Station) and most—if not all—customers purchase all the Products they anticipate needing while "discounted" as part of a new system purchase.

65.    In the case of the Base Station, this Product can *only* be purchased as part of a new system, so it is necessarily *always* discounted.

66.    Thus, most if not all of Defendant's Products are sold at purportedly discounted prices, and so it is those "discounted" prices that set their prevailing market prices—not Defendant's inflated Reference Prices.

67.    To the extent that Defendant's Reference Prices might be construed as comparison prices from third-party resellers, those resellers all sell the Products at prices that are significantly lower than Defendant's Reference Prices.

68.    In other words, Defendant's Reference Prices are not bona fide comparison prices, are not bona fide prevailing market prices, and are not true market values for the Products—they are made-up prices used for the sole purpose of enabling a subsequent offer of a large reduction from those prices.

### *SimpliSafe Misrepresents its "Sales" to be Limited-Time Offers*

69.    As detailed above, Defendant represents that its sales to be time-limited by including language such as "ENDS TUESDAY," "ENDS TOMORROW," and "ENDS MIDNIGHT," indicating that customers will lose out on the discounts if they wait any longer to make purchases.

70.    In reality, customers are simply presented with a roughly equivalent or *better* deal if they wait to purchase Products until after the advertised expiration date.

71.    For example, on October 4, 2024, Defendant advertised a "20% discount off any new system + free indoor camera with professional monitoring" that "ENDS SOON." But on October 7, 2024, Defendant advertised "50% off + FREE INDOOR CAMERA on any new system with professional monitoring."

72.    On November 3, 2024, Defendant advertised "50% OFF + FREE $100

VISA GIFT CARD on any new system with professional monitoring" that "ENDS 11PM." But on November 4, 2024, Defendant advertised "60% OFF + FREE OUT-DOOR CAMERA on any new system with professional monitoring. Based on Defendant's own Reference Prices, the indoor camera is valued at $199.99, so the switch from a free $100 Visa gift card to a free outdoor camera was also a better deal for customers.

73.    On November 24, 2024, Defendant advertised "60% OFF on any new system with professional monitoring" that "ENDS MIDNIGHT." But on November 25, 2024, Defendant advertised "70% OFF + FREE outdoor camera on any new system with professional monitoring.

74.    Defendant preys on the fact that reasonable consumers reasonably interpret these advertisements to mean that it will charge *full* Reference Prices for its new system Products once the advertised expiration date passes, so if they wait too long to purchase Products, then they will miss out on the advertised "discounts."

### *SimpliSafe's Advertisements Violate California Law*

75.    California's False Advertising Law ("FAL") prohibits any business from making statements concerning its products or services that it knows or should know to be untrue or misleading. *See* Cal. Bus. & Prof. Code § 17500. This prohibition includes false or misleading statements suggesting that a product is discounted from a bona fide former price when, in reality, the former price is a fictitious one. *See e.g.*, Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price [. . .] within three months.").

76.    Further, California's Consumer Legal Remedies Act ("CLRA") prohibits "[a]dvertising goods or services with the intent not to sell them as advertised," as well as "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9) & (13).

77.    California's Unfair Competition Law ("UCL") generally outlaws "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

78.    Moreover, the Federal Trade Commission's regulations on pricing confirm that Defendant's scheme is unfair and deceptive. These regulations prohibit false or misleading "former price comparisons," such as making up "an artificial, inflated price … for the purpose of enabling the subsequent offer of a large reduction" off that price. 16 C.F.R. § 233.1. They also prohibit false or misleading "retail price comparisons" that falsely suggest that the seller is "offer[ing] goods at prices lower than those being charged by others for the same merchandise" when this is not the case. 16 C.F.R. § 233.1.

79.    As detailed above, Defendant continuously made false and misleading statements about its Reference Prices throughout the relevant period. Defendant also made false or misleading statements of fact concerning reasons for, the existence of, or amounts of price reductions throughout the relevant period.

80.    Specifically, Defendant has continuously advertised sales during which new system Products are purportedly discounted from former or regular prices (i.e., Reference Prices). Despite never really ending, Defendant misrepresents that its sales will end soon by including language in its advertisements such as "ENDS TUESDAY," "ENDS TOMORROW," and "ENDS MIDNIGHT," indicating that consumers will lose out on the advertised discounts if they wait any longer than this to make purchases.

81.    These false expiration dates lead reasonable consumers to believe that customers actually purchased new system Products at their listed Reference Prices prior to the current sale, and that the prices for new system Products will revert back to Reference Prices once the sale ends.

82.    But, in reality, for any given sale in the relevant period, Defendant advertised a nearly identical deal, or even better deal, both immediately before *and* after that sale.

83.     The Reference Prices for Defendant's new system Products also are not bona fide comparison prices because no other retailers sell them for those prices; nor are they bona fide prevailing market prices because the vast majority of Products are sold by Defendant as new systems, which are *always* discounted; and they are not true market values. They are false reference prices used solely to induce potential customers into purchasing and paying higher prices for Products.

84.     Defendant knew and counted on the reasonable beliefs of consumers to induce them into purchasing Products they would not have otherwise purchased and paying higher prices than they would have otherwise paid for the Products.

85.     In short, Defendant has continuously advertised its new system Products with the intent not to sell them as advertised—by advertising them as possessing prevailing market prices or values that were not bona fide—and with false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions.

86.     Defendant's false reference pricing scheme is patently unfair and deceptive. As described above, Defendant advertises fake discounts from false Reference Prices, which induces consumers to purchase the Products and pay higher prices for the Products, resulting in substantial economic injury to consumers.

87.     Reasonable consumers who rely on Defendant to provide accurate and truthful representations about its Product prices and durations of price reductions, and make important purchasing decisions based on those representations, cannot reasonably avoid this injury, and Defendant's false discounts offer no countervailing benefits to the public. Misrepresenting the Products' prices and the duration of price reductions solely benefits Defendant, enabling it to sell more Products at higher prices than it otherwise could, while harming consumers and honest competitors alike.

88.     As such, Defendant's business practices are unfair, deceptive, false, and misleading, and are in violation of California's laws and important public

policies.

### *SimpliSafe's False Reference Pricing Scheme Harms Consumers*

89.    Empirical research indicates that "[i]nflated reference prices can […] increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products." Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999). These retailer-positive outcomes result from several distinct types of inferences consumers make about advertised reference prices. *See* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118-22 (1994).

90.    *First*, consumers infer that "the 'regular' price reflects the product's intrinsic value, and therefore is a fair price for the product." *Id.*, at p. 119. "If the consumer wished to purchase a product of the quality indicated by the retailer's regular price, he or she might be induced to take advantage of the advertised savings to do so." *Id.*

91.    *Second*, consumers infer that "the retailer's 'regular' price reflects the prevailing competitive price and therefore is the market price of the product." *Id.* "Under the second inference, consumers may believe that rational retailers, aware of market conditions, set and adjust their regular prices so as to be competitive in that market." *Id.*, at pp. 118-19. "The direct effect of this inference is to limit active consumer search for competitor price information." *Id.*, at p. 119.

92.    *Third*, consumers infer that "the 'regular' price becomes the penalty price paid only by those unable to wait even the short time for the retailer's frequent sales events." *Id.*, at p. 122. In other words, this inference creates a sense of urgency among consumers to buy now.

93.    In a study measuring the effects of false reference pricing on

consumers' purchasing behavior, "[p]articipants were more likely to purchase an item when the selling price appeared discounted" from made-up original prices. Jennie Huang, *The Trill of the Deal: Quantifying the Price of Perceived Discounts and Mark-ups*, manuscript, p. 11 (2018). "Moreover, the larger the perceived discount, the higher the purchasing rate." *Id.*

94.    It was observed that a perceived discount of 10% led to a 3.8 percentage point increase in the purchasing rate, while a perceived discount of 20% led to a 6% increase, and a perceived discount of 40% led to a 10.7 percentage point increase. *Id.*, pp. 11 & 38, Table A1.

95.    Using these tactics, Defendant leads reasonable consumers to believe that its struck-out Reference Prices represent former or regular prices for the Products (i.e., prices at which new system Products were recently sold prior to the current sale, and at which they will be sold again once that sale ends). In other words, reasonable consumers reasonably believe that Defendant's Reference Prices represent amounts that customers must normally pay for new system Products, did pay before the current "sale" began, and will pay again after that "sale" ends.

96.    Reasonable consumers also reasonably believe that Defendant's advertised Reference Prices represent the prevailing market prices or true market values of its Products (i.e., prices at which its Products are typically offered for sale throughout the market). In other words, reasonable consumers reasonably believe that Defendant's Reference Prices represent amounts that consumers normally must pay for the Products if purchased elsewhere.

97.    Reasonable consumers reasonably conclude that by purchasing Products during one of Defendant's advertised sales, before the advertised expiration date, they are receiving—at the advertised discount—Products with prevailing market prices and true market values equal to the advertised Reference Prices. For example, for a Product purportedly marked down to $292.00 from $729.90, reasonable consumers expect that they are receiving a $437.90 discount off a bona fide

former or regular price and that the Product has a true market value that is 437.90 greater than what they are spending.

98.    As discussed above, Defendant never actually sells this Product for its Reference Price, and the prices at which resellers sell the Products suggest that their true market values are substantially *less* than Defendant's Reference Prices.

99.    Reasonable consumers then *buy* Defendant's products expecting to receive the benefit of their bargain—a discount in the *full* amount being advertised—which they reasonably fear they will lose access after the advertised expiration date.

100.    However, Plaintiffs' and Class Members' reasonable expectations were *not* met. Instead of receiving significant discounts during time-limited sales, Plaintiffs and Class Members received little or no discounts because the sales never end; and instead of receiving Products with market values equal to Defendant's Reference Prices, they received items worth *far less*.

101.    Defendant's illegal advertisements harm consumers by depriving them of the reasonable expectations to which they are entitled.

102.    Defendant is incentivized to engage in this illegal conduct because consumers who are presented with discounts are substantially more likely to make purchases: "[n]early two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase,"[12] while, "two-thirds of consumers have made a purchase they weren't originally planning to make solely based on finding a coupon or discount," and "80% [of consumers] said they feel encouraged to make a first-time purchase with a brand that is new to them if they found an offer or discount."[13]

---

[12]  https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/

[13] RetailMeNot Survey: Deals and Promotional Offers Drive Incremental Purchases Online, Especially Among Millennial Buyers (prnewswire.com)

103.   Similarly, when consumers believe that an offer is expiring soon, it creates a sense of urgency that makes them more likely to buy a product and less likely to comparison shop or make purchases from other retailers.[14]

104.   Defendant's advertisements harm consumers by inducing them, based on false or misleading information, to make purchases they would not have otherwise made.

105.   Further, research "suggest[s] that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, *supra*, at p. 66. One study showed that "on average, consumers were willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay $250.80 for the identical product with a $429.00 reference price." *Id*.

106.   Defendant's false and misleading advertisements artificially increase consumer demand for its Products, creating upward pressure on the prices it can charge for its Products.

107.   As a result, consumers pay higher prices for the Products than they would absent the falsities and misrepresentations described above.

### *Plaintiffs Were Misled by SimpliSafe's Advertisements*

108.   On November 16, 2023, Plaintiff Travis Schlueter-Beckner purchased a new custom home security system from Defendant. Included in his purchase was: 1 x Base Station; 2 x Wireless Keypads; 2 x Entry Sensors; 1 x Panic Button; 3 x Motion Sensor Gen 2's; 3 x Smoke & CO Detectors; 4 x Water Sensors; 1 x Free

---

[14] https://cxl.com/blog/creating-urgency/ (addition of a countdown timer increased conversion rates from 3.4%-10%); Dynamic email content leads to 400% increase in conversions for Black Friday email | Adestra (uplandsoftware.com) (400% higher conversation rate for ad with countdown timer); *see also* Dhruv Grewal & Larry D. Compeau, Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

FIRST AMENDED CLASS ACTION COMPLAINT

Yard Sign; 2 x Freeze Sensors; 2 x Window Decals; and 1 x Smart Alarm Wireless Indoor Security Camera.

109.    Mr. Schlueter-Beckner's receipt shows that Defendant advertised the value of his purchase as $884.81, and that he received a discount of $586.81.

110.    Mr. Schlueter-Beckner recalls that, at the time of his purchase, Defendant advertised that the Products were on "sale" at their best prices of the year and that the sale had an expiration date just a few days away.

111.    Before purchasing the Products, Mr. Schlueter-Beckner had been comparison shopping. When he made his purchase, he had not completed his search and evaluation of competing options. However, he felt pressured to make the purchase right away because Defendant advertised the sale with an imminent expiration date.

112.    At various points throughout the process of viewing the Products on Defendant's website, adding them to his online shopping cart, and checking out with them, the Products were advertised with struck-out Reference Prices shown next to purportedly discounted prices.

113.    Mr. Schlueter-Beckner believed that the advertised Reference Prices represented prices that other customers had to pay for the same Products prior to the "sale," and he further believed that Defendant would charge those Reference Prices for the Products again as soon as it ended.

114.    Mr. Schlueter-Beckner read and relied on these representations from Defendant's website, including in his online shopping cart and checkout page, and order confirmation email, that the Products were on sale and being sold to him at a discount from their regular prices (i.e., Reference Price).

115.    Thus, Mr. Schlueter-Beckner reasonably believed that he was receiving a substantial discount off the regular prices charged for the Products, was receiving products with substantially higher market values than the prices he paid for them, and would miss out on the benefit of this "bargain" if he did not purchase the

Products during the advertised sale.

116.    Mr. Schlueter-Beckner would not have the purchase but for these reasonable beliefs based on Defendant's representations described above. If he had been aware of the fact that Defendant's new system Products were always on sale and that the discount being offered to him was frequently offered by Defendant, then he would not have made the purchase and would have continued to comparison shop for competing options.

117.    On June 7, 2024, Plaintiff Zach Babka purchased a new custom home security system from Defendant. Included in his purchase was: 1 x Base Station; 1 x Wireless Keypad; 16 x Entry Sensors; 1 x Video Doorbell Pro; 1 x SimpliCam 1080p; 1 x Motion Sensor Gen 2; 2 x Outdoor Security Cameras; 1 x Free Yard Sign; 2 x Window Decals; and 1 x Fast Protect Professional Monitoring.

118.    Mr. Babka's receipt shows that Defendant advertised the value of his purchase as $1,122.79, and that he received a discount of $561.50.

119.    Mr. Babka recalls that, at the time of his purchase, Defendant advertised that the Products were on "sale" with a "discount," and that the sale had an expiration date just a few days away.

120.    Before purchasing the Products, Mr. Babka had been comparison shopping. When he made his purchase, he had not completed his search and evaluation of competing options. However, he felt pressured to make the purchase right away because Defendant advertised the sale with an imminent expiration date.

121.    At various points throughout the process of viewing the Products on Defendant's website, adding them to his online shopping cart, and checking out with them, the Products were advertised with struck-out Reference Prices shown next to purportedly discounted prices.

122.    Mr. Babka believed that the advertised Reference Prices represented prices that other customers had to pay for the same Products prior to the "sale,"

and he further believed that Defendant would charge those Reference Prices for the Products again as soon as it ended.

123.   Mr. Babka read and relied on these representations from Defendant's website, including in his online shopping cart and checkout page, and order confirmation email, that the Products were on sale and being sold to him at a discount from their regular prices (i.e., Reference Price).

124.   Thus, Babka reasonably believed that he was receiving a substantial discount off the regular prices charged for the Products, was receiving products with substantially higher market values than the prices he paid for them, and would miss out on the benefit of this "bargain" if he did not purchase the Products during the advertised sale.

125.   Mr. Babka would not have the purchase but for these reasonable beliefs based on Defendant's representations described above. If he had been aware of the fact that Defendant's new system Products were always on sale and that the discount being offered to him was frequently offered by Defendant, then he would not have made the purchase and would have continued to comparison shop for competing options.

### *No Adequate Remedy at Law*

126.   Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the deceptive and unfair advertising practices described above. Plaintiffs would consider purchasing Products from Defendant again in the future if they could reasonably believe that their advertised Reference Prices and resulting discounts were truthful.

127.   Thus, without an injunction, Plaintiffs and Class Members have no realistic way of knowing if any of Defendant's Reference Prices, purported discounts, and supposedly time-limited sales are legitimate, so they are unable to rely on Defendant's advertising in the future. Further, the public at large—not knowing of Defendant's untrue and misleading conduct—cannot reasonably avoid injury if

purchasing the Products from Defendant in the future. Thus, Plaintiffs, Class Members, and the public at large face an imminent threat of future harm without an injunction.

### Simplisafe Fails to Comply with California Law as to Its Monitoring Services

128.   Defendant also offers, for a monthly fee, various types of monitoring services for use in conjunction with consumer's purchased security systems, such as constant home monitoring, instant alarm response, downloadable camera imaging, "AI mediated" camera review, and faster police response (the "Monitoring Services").

129.   A purchaser of SimpliSafe's products can sign up for the Monitoring Services either through SimpliSafe's website or its consumer phone application or App. Signing up is made purposefully easy, needing only a few clicks and entry of payment information.

130.   However, cancellation is not so simple. SimpliSafe does not offer its customers any way to cancel their Monitoring Services other than through a phone call. A customer who searches through the App will only find a phone number: "to modify, suspend, or cancel your monitoring plan, contact us at 1-800-203-4124."[15]

131.   To cancel through a customer's account page accessed through the website is even more difficult. There is no option to cancel the Monitoring Services on either a customer's "manage account" page or their "monitoring" page. Rather, on information and belief, a customer has to navigate to SimpliSafe's help center in order to locate the cancellation phone number.

132.   Under the version of California's Automatic Renewal Law ("ARL"), codified at Cal. Bus. & Prof. Code § 17602, in effect prior to July 1, 2025, "a business

---

[15] Upon information and belief, Defendant's agents who answer at this number are tasked with convincing customers seeking to cancel their subscription to keep their Monitoring Services by offering them discounts on the monthly fee.

FIRST AMENDED CLASS ACTION COMPLAINT

that allows a consumer to accept an automatic renewal or continuous service offer online shall allow a consumer to terminate the automatic renewal or continuous service exclusively online, at will, and without engaging any further steps that obstruct or delay the consumer's ability to terminate the automatic renewal or continuous service immediately."[16]

133.    Defendant failed to comply with this mandate. Instead of allowing its customers who signed up for Monitoring Services online, whether through the website or the App, to cancel online, Defendant forces customers to cancel through a laborious phone cancellation system.

134.    Defendant's actions violate the ARL and, by extension, the FAL, CLRA, and UCL. *Zeller v. Optavia LLC*, No. 22-CV-434-DMS-MSB, 2024 WL 1207461, at *4 (S.D. Cal. Mar. 14, 2024) ("Courts have recognized that a consumer who has been harmed by a violation of the ARL may bring a claim pursuant to other California consumer protection statutes, including the FAL, CLRA, and UCL.").

## CLASS ACTION ALLEGATIONS

135.    Plaintiffs brings this action on behalf of themselves and as a class action on behalf of members of the following defined Class:

- All persons who, while in the state of California and within the applicable statute of limitations period, purchased from Defendant's website one or more Products advertised with a discount on Defendant's website.

136.    **Numerosity and Ascertainability.** The proposed Class contains members so numerous that a separate joinder of each member of the class is impractical. There are thousands or perhaps even tens of thousands of class

---

[16] Courts have recognized that "a 'consumer who has been harmed by a violation of the ARL may bring a claim pursuant to other [California] consumer protection statutes, including the FAL, CLRA, and UCL.' " *Morrell v. WW Int'l, Inc.*, 551 F. Supp. 3d 173, 182 (S.D.N.Y. 2021) (quoting *Arnold v. Hearst Mag. Media, Inc.*, No. 19-CV-1969-WQH, 2021 WL 488343, at *6 (S.D. Cal. Feb. 10, 2021)) (alteration in original).

members, each of whom can be identified through Defendant's sales records and/or through public notice.

137. **Existence and Predominance of Common Issues.** Common questions of law and fact exist as to all Class Members, which predominate over issues affecting individual Class Members, including, but not limited to:

a.     Whether Defendant falsely advertised Reference Prices for its Products as being former prices for those Products;

b.     Whether Defendant falsely advertised Reference Prices for its Products as being prevailing market prices for those Products;

c.     Whether the purported discounts advertised by Defendant accurately reflected any actual discounts or savings off bona fide Reference Prices;

d.     Whether Defendant falsely advertised the expiration dates of sales on its website;

e.     Whether Defendant made any other false or misleading statements of fact in its advertisements;

f.     Whether Plaintiffs and Class Members reasonably relied on Defendant's false and/or misleading advertisements when purchasing its Products;

g.     Whether Defendant's conduct constitutes violations of California's False Advertising Law, Consumer Legal Remedies Act, and/or Unfair Competition Law;

h.     Whether Defendant's conduct constitutes violation any other federal and/or California pricing regulations; and

i.     Whether Plaintiffs and Class Members sustained damages as a result of any of the aforementioned violations, and, if so, the proper measure of their damages, including interest, penalties, attorneys' fees, costs, and equitable relief.

138. **Typicality.** Plaintiffs' claims are typical of the proposed Class. Plaintiffs, like all other Class Members, purchased one or more qualifying Products from Defendant while advertised on its website as being discounted from Reference

Prices that were not bona fide former prices or prevailing market prices for the Products.

139.  **Adequacy.** There are no material conflicts of interest between Plaintiffs and the proposed Class that would make class certification inappropriate. Plaintiffs will fairly and adequately protect the interests of the proposed Class, and they understand their obligation to inform the Court of any relationships, conflicts, or differences with any Class Member(s). Moreover, Plaintiffs have retained competent attorneys as proposed class counsel, who are well-versed in the rules governing class action discovery, certification, and settlement, and who will vigorously assert the claims of all Class Members.

140.  **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this dispute. The damages incurred by individual Class Members, while significant, are small in comparison to the burden and expense of individualized litigation over Defendant's conduct. Further, the court system would be overwhelmed by individual lawsuits if all Class Members separately sought redress. Such individualized litigation increases the delay and expense to all parties, and to the court system, due to the complex legal and factual issues of this case.

141.  Individualized litigation also creates the potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; it allows the hearing of claims that might otherwise go unaddressed because of the relative expense of bringing individual lawsuits, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

142.  Plaintiffs contemplate providing individual notice to all members of the Class defined above as identified through Defendant's sales records and/or through public notice.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Violation of California's False Advertising Law

### *Bus. & Prof. Code §§ 17500, et seq.*

### (On Behalf of Plaintiffs and the Class)

143.   Plaintiffs repeat and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

144.   Plaintiffs brings this cause of action on behalf of themselves and all members of the Class.

145.   Bus. & Prof. Code § 17500 provides that "[i]t is unlawful [. . .] with intent directly or indirectly to dispose of real or personal property [. . .] to make or disseminate [. . .] any advertising device [. . .] which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or [. . .] with the intent not to sell that personal property [. . .] so advertised at the price stated therein, or as so advertised."

146.   Bus. & Prof. Code § 17501 further provides: "No price shall be advertised as a former price of any advertised thing, *unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding* the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement." (Emphasis added).

147.   As alleged more fully above, Defendant continuously advertises time-limited sales its website during which its Products are all advertised as being discounted from purported former prices ("Reference Prices") when purchased as part of a new system.

148.   However, Defendant's sales never truly end. Each day after a sale is advertised to end, Defendant simply advertises another sale with a slightly different discount, ofttimes rotating back and forth between the exact same two sales

over and over again.

149.    In addition to advertising these sales on a banner at the top of its website, Defendant advertises Products on its website alongside specified percentages off, purportedly discounted prices, and struck-out Reference Prices. These representations are also made in customers' shopping carts and during the checkout process, where Defendant further calculates and displays customers' purported savings.

150.    Plaintiffs and Class Members reasonably understood these advertisements to represent discounts from former or regular prices for the Products, which customers paid before the sale began, would pay again after the sale ends, and/or currently pay if purchased elsewhere.

151.    However, unbeknownst to Plaintiffs and the Class, the Reference Prices advertised by Defendant as being former or regular prices were never the prevailing market prices for its Products. Nor do Defendant's advertisements indicate whether or when the Reference Prices were ever actually paid for new system Products because, in reality, the Products have never been sold for their advertised Reference Prices when purchased as part of a new system—only at discounted prices.

152.    Defendant's representations about the former and/or regular prices of its Products were and continue to be untrue and misleading.

153.    This practice of advertising Products at continuously discounted prices along with Reference Prices passed off as former or regular prices, which are materially greater than actual prevailing market prices for the Products, constitutes an untrue and misleading advertising practice in violation of California's False Advertising Law.

154.    As a result, Defendant violated, and continues to violate, Sections 17500 and 17501. As a result of Defendant's misrepresentations, Plaintiff and Class Members have been induced to purchase Products they would not have otherwise

purchased and/or pay higher prices than they would have otherwise paid for the Products.

155.  Defendant's misrepresentations were intended to induce reliance, and Plaintiffs saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in each Plaintiff's decision to purchase the Products.

156.  In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them to be important in deciding whether to buy the Products.

157.  Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because they believed the Products had greater market values, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values substantially lower than the promised market values.

158.  Defendant's acts and omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiffs purchased the Products. Defendant's conduct is part of a pattern of untrue, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

159.  Plaintiffs, on behalf of themselves and all members of the proposed Class, request that this Court order Defendant to restore money to Plaintiff and Class Members, and to enjoin Defendant from continuing these false and misleading practices in violation of the FAL. Otherwise, Plaintiff, Class Members, and the broader public will be irreparably harmed and/or denied an effective and complete remedy.

### SECOND CAUSE OF ACTION

## Violation of California's Consumer Legal Remedies Act

### *Cal. Civ. Code §§ 1750, et seq.*

### (On Behalf of Plaintiffs and the Class)

160.   Plaintiffs repeat and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

161.   Plaintiffs brings this cause of action on behalf of themselves and all members of the Class.

162.   Plaintiffs and Class Members are "consumers" as that term is defined by Cal. Civ. Code § 1761(d). "'Consumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." *Id.*

163.   Plaintiffs and Class Members have engaged in "transactions" with Defendant as that term is defined by Cal. Civil Code § 1761(e). "'Transaction' means an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id.*

164.   Plaintiffs and Class Members purchased "goods" from Defendant as that term is defined by Cal. Civil Code § 1761(a). "'Goods' means tangible chattels bought or leased for use primarily for personal, family, or household purposes [. . .]" *Id.*

165.   Defendant violated, and continues to violate, numerous provisions of Section 1770(a) of the California Civil Code.

166.   Defendant violated, and continues to violate, Section 1770(a)(5) of the California Civil Code by representing that Products offered for sale on its website have characteristics or benefits that they do not have. Specifically, Defendant represents that the value of its Products is greater than in reality by advertising inflated Reference Prices for the sole purpose of enabling subsequent offers of large

1  reductions from those prices.

2  167.   Defendant violated, and continues to violate, Section 1770(a)(9) of the

3  California Civil Code by advertising its Products by advertising them as possessing

4  significantly greater prevailing market prices or market values than in reality.

5  168.   Finally, Defendant violated, and continues to violate, section

6  1770(a)(13) by making false or misleading statements of fact concerning reasons

7  for, existence of, or amounts of, price reductions on its website, including by: (1)

8  advertising discounts and savings that are exaggerated or nonexistent; (2) contin-

9  uously advertising sales with expiration dates that do not actually expire; and/or

10  (3) misrepresenting that the discounts and savings are unusual, when in fact they

11  are regularly available.

12  169.   Defendant's misrepresentations were likely to deceive, and did deceive,

13  Plaintiffs and other reasonable consumers who are members of the proposed Class.

14  Defendant knew or should have known, through the exercise of reasonable care,

15  that these statements were untrue and misleading.

16  170.   Defendant's misrepresentations were intended to induce reliance, and

17  Plaintiffs saw, read, and reasonably did rely on them when purchasing Defendant's

18  Products. Defendant's misrepresentations were a substantial factor in each Plain-

19  tiff's decision to purchase the Products.

20  171.   In addition, Class-wide reliance can be inferred because Defendant's

21  misrepresentations were material, i.e., a reasonable consumer would consider

22  them to be important in deciding whether to buy the Products.

23  172.   Plaintiffs and Class Members were injured as a direct and proximate

24  result of Defendant's conduct because (a) they would not have purchased the Prod-

25  ucts if they had known the truth, (b) they overpaid for the Products because they

26  believed the Products had greater market values, and/or (c) they did not receive

27  the discounts they were promised, and instead received Products with market val-

28  ues substantially lower than the promised market values.

173.   Defendant's acts and omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiffs purchased the Products. Defendant's conduct is part of a pattern of untrue, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

174.   Plaintiffs seek damages and, alternatively, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiffs' equitable claims are different than and do not require the same showings as Plaintiffs' legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

175.   Plaintiffs also seek an injunction. Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive practices described above. Thus, Plaintiffs, Class Members, and the public at large face an imminent threat of future harm. Plaintiffs would consider purchasing Products from Defendant again in the future if they could reasonably believe that Defendant's Reference Prices accurately reflect its former or regular prices, and that the market value of its Products and discounts were truthful. Without an injunction, Plaintiffs, Class Members, and the public at large have no realistic way of knowing which—if any—of Defendant's Reference Prices, purported discounts, and/or time-limited sales are not untrue or misleading. Accordingly, Plaintiffs, Class Members, and the public at large cannot rely on Defendant's advertising in the future and cannot reasonably avoid injury if purchasing the Products from Defendant in the future.

176.   Finally, the remedies at law available to Plaintiffs and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

177.   Accordingly, pursuant to California Civil Code § 1780(a)(2), Plaintiffs, on behalf of themselves and all other members of the Class, seek public injunctive relief.

178.   CLRA § 1782 NOTICE. On February ~~18~~19, 2025, a CLRA demand letter was sent to Defendant's headquarters in Boston, Massachusetts via certified mail (return receipt requested), which provided notice to Defendant of its violations of the CLRA, and demanded that Defendant correct the unlawful, unfair, false, and/or deceptive practices complained of herein. Defendant does not have a principal place of business in California. An identical CLRA demand letter was sent on February 18, 2022, via certified mail (return receipt requested) to Defendant's registered corporate agent in California: C T Corporation System, 330 N. Brand Blvd., Glendale, CA 91203. ~~If Defendant does not fully correct, or agree to fully correct, the problems alleged by Plaintiffs, for themselves and for each member of the proposed Class, within 30 days of receipt, then Plaintiffs will seek all monetary relief allowed under the CLRA, including actual, punitive, and statutory damages, as appropriate.~~

179.   Plaintiffs' February 19, 2025, CLRA demand letter included, among other things, a demand for cure refunding: (1) the full amount of the discount that was advertised to them; and (2) the full amounts of all discounts advertised to all other persons who, while in the state of California and within the applicable statute of limitations period, purchased directly from Defendant's website one or more Products advertised at a discount on Defendant's website.

180.   Defendant, by and through its registered corporate agent in California, received Plaintiffs' CLRA demand letter on February 24, 2025, and had 30 days

from receipt (i.e., March 26, 2025) to respond to Plaintiffs' CLRA demand letter.

181.   As of March 26, 2025, Defendant failed to respond to Plaintiffs' CLRA demand letter. As such, Defendant has failed to adequately correct, repair, replace, or otherwise rectify the issues raised therein within the required statutory period.

178.182.   Plaintiffs, on behalf of themselves and all other members of the Class, seek actual, punitive, and statutory damages, as appropriate against Defendant. Plaintiffs additionally seek costs and reasonable attorneys' fees pursuant to Cal. Civ. Code § 1780(e).

179.183.   A declaration of venue pursuant to Cal. Civ. Code § 1780(d) is was filed concurrently with the filing of this the original complaint.

**THIRD CAUSE OF ACTION**

**Violation of California's Unfair Competition Law**

***Bus. & Prof. Code §§ 17200, et seq.)***

**(On Behalf of Plaintiffs and the Class)**

180.184.   Plaintiffs repeat and incorporate by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

181.185.   Plaintiffs brings this cause of action on behalf of themselves and all members of the Class.

182.186.   Defendant has violated California's Unfair Competition Law (UCL) by engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the three prongs of the UCL).

### The "Unlawful" Prong

183.187.    Defendant engaged in unlawful conduct by violating the FAL and CLRA, as alleged above and incorporated herein. In addition, Defendant engaged in unlawful conduct by violating the Federal Trade Commission Act ("FTCA"). The FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" and prohibits the dissemination of false advertisements. 15 U.S.C. § 45(a)(1), 15 U.S.C. § 52(a). As the FTC's regulations make clear, Defendant's false referencing pricing scheme violates the FTCA. 16 C.F.R. § 233.1, § 233.2.

### The "Deceptive" or "Fraudulent" Prong

184.188.    As alleged in detail above, Defendant's representations that its Products were temporarily discounted during time-limited sales, that its Reference Prices represented former or regular prices for the Products, or for those of similar products, that customers were receiving true discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the advertised Reference Prices were untrue and misleading.

185.189.    Defendant's representations were likely to deceive, and did deceive, Plaintiffs and other reasonable consumers who are members of the proposed Class. Defendant knew or should have known, through the exercise of reasonable care, that these statements were untrue and misleading.

### The "Unfair" Prong

186.190.    As alleged in detail above, Defendant committed "unfair" acts by falsely advertising that its Products were temporarily discounted during time-limited sales, that its Reference Prices represented former or regular prices for the Products, or for those of similar products, that customers were receiving true discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the advertised Reference Prices, when none of this was true.

187.191.    Defendant violated established public policy by violating the

CLRA, the FAL, and the FTCA, as alleged above and incorporated here. The unfairness of this practice is tethered to a legislatively declared policy (that of the CLRA and FAL).

188.192.    These unfair acts caused Plaintiffs and members of the proposed Class to buy Products they otherwise would not have purchased, pay more for the Products than they otherwise would have paid, and/or be deprived of their expectancy interest in receiving the Products as advertised.

189.193.    The harm to Plaintiffs and Class Members greatly outweighs any public utility of Defendant's conduct. Their injuries were not outweighed by any countervailing benefits to consumers or competition, as there is no public utility to misrepresenting the duration of sales, amounts of discounts, or prices of Products to consumers. There were reasonably available alternatives to further Defendant's legitimate business interests other than the untrue and misleading conduct described herein.

### *The Class Was Harmed*

190.194.    For each prong, Defendant's misrepresentations were intended to induce reliance, and Plaintiffs saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in each Plaintiff's decision to purchase the Products.

191.195.    Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them to be important in deciding whether to buy the Products.

192.196.    Plaintiffs and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because they believed the Products had greater market values, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values substantially lower than the promised market values.

193.197.     Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiffs purchased the Products. Defendant's conduct is part of a pattern of untrue, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

194.198.     Plaintiffs seek damages and, alternatively, restitution. Plaintiffs are permitted to seek equitable remedies in the alternative because they have no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiffs' equitable claims are different than and do not require the same showings as Plaintiffs' legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

195.199.     Plaintiffs also seek an injunction. Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive practices described above. Thus, Plaintiffs, Class Members, and the public at large face an imminent threat of future harm. Plaintiffs would consider purchasing Products from Defendant again in the future if they could reasonably believe that Defendant's Reference Prices accurately reflect its former or regular prices, and that the market value of its Products and discounts were truthful. Without an injunction, Plaintiffs, Class Members, and the public at large have no realistic way of knowing which—if any—of Defendant's Reference Prices, purported discounts, and/or time-limited sales are not untrue or misleading. Accordingly, Plaintiffs, Class Members, and the public at large cannot rely on Defendant's advertising in the future and cannot reasonably avoid injury if purchasing the Products from Defendant in the future.

196.200.    Finally, the remedies at law available to Plaintiffs and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment as follows:

A.    For an Order:

    a.  Certifying the Class;

    b.  Appointing Plaintiffs as representatives of the Class;

    c.  Appointing Plaintiffs' counsel as Class Counsel;

B.    For actual and liquidated damages according to proof at trial;

C.    For restitution and disgorgement of all profits and unjust enrichment;

D.    For statutory and civil penalties and special damages, according to proof at trial;

E.    For pre- and post-judgment interest on monetary damages;

F.    For preliminary and permanent injunctive relief;

G.    For reasonable attorneys' fees and costs and expert fees and costs as allowed by law; and

H.    For such other relief as this Court deems just and proper.

Dated:    May 5, 2025February 18, 2025              Respectfully submitted,

**KING & SIEGEL LLP**

By: _____

Brent Boos, Esq.
Elliot Siegel, Esq.
Attorneys for Plaintiffs and
the Putative Class

FIRST AMENDED CLASS ACTION COMPLAINT