IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Travis Schlueter-Beckner, et al., <br>     Plaintiffs, <br> v. <br> SimpliSafe, Inc., et al., <br>     Defendants. | Case No. 3:25-cv-01764 (CRB) <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION** |

This case involves false-advertising and unfair-business-practices claims against an internet seller, SimpliSafe, Inc. The immediate question here is whether Defendant SimpliSafe's arbitration clauses in its Terms of Sale and Terms of Service are binding on Plaintiffs such that the Court should stay this action and order arbitration.

For the following reasons, the Court GRANTS SimpliSafe's motion with respect to Plaintiff Schlueter-Beckner's Automatic Renewal Law claim and DENIES its motion with respect to his other claims and all of Plaintiff Babka's claims.

**I.     BACKGROUND**

    **A.     The Underlying Dispute**

SimpliSafe sells security hardware and related services. Plaintiffs Travis Schlueter-Beckner and Zach Babka completed two separate transactions with SimpliSafe: they (1) purchased security system hardware and (2) enrolled in a free trial of SimpliSafe's alarm monitoring service for that hardware. Plaintiffs primarily allege various false-advertising claims relating to the hardware purchases under California law. Am. Compl. (dkt. 19) ¶¶ 143–200. They also allege a violation of California's Automatic Renewal Law relating to the monitoring service. Id. ¶¶ 128–34.

1  SimpliSafe asserts that each Plaintiff agreed to arbitrate this dispute on two separate
2  occasions—once at the time of sale and again when enrolling for the monitoring service.
3  SimpliSafe's operative Terms of Sale and Terms of Service both contained binding
4  arbitration clauses.  See Schlueter-Beckner Terms of Sale (dkt. 13-2, Ex. 3) at 22–24;
5  Schlueter-Beckner Terms of Service (dkt. 13-2, Ex. 4) ¶ 39; Babka Terms of Sale (dkt. 13-
6  2, Ex. 5) at 61–65; Babka Terms of Service (dkt. 13-2, Ex. 6) ¶ 39.  SimpliSafe contends
7  Plaintiffs assented to both contracts at the time of sale and that they assented to the Terms
8  of Service again when enrolling for the alarm service.  Mot. (dkt. 13-1) at 12–16.

Both the Terms of Sale and Terms of Service require arbitration before the American Arbitration Association in accordance with its Consumer Arbitration Rules.  E.g., Schlueter-Beckner Terms of Sale at 22–24.  Those rules stipulate that "the arbitrator shall have the power to rule on their own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement."  American Arbitration Association, Consumer Arbitration Rules and Mediation Procedures r. 7(a) (2025) (cleaned up).

### B.     The Hardware Sales

Both Plaintiffs separately purchased security system hardware online within the last two years.  Schlueter-Beckner Decl. (dkt. 20-2) ¶ 4; Babka Decl. (dkt. 20-3) ¶ 4.  Plaintiffs completed their transactions on SimpliSafe's website.  As pictured below, at the bottom of the last webpage before Plaintiffs placed their orders there was a disclosure in small, gray text with hyperlinks to SimpliSafe's Terms of Sale, Terms of Service, and Privacy Policy.  Point of Sale Screenshot (dkt. 13-2, Ex. 2).  After entering the relevant payment information into that final webpage, Plaintiffs clicked a large, colored button with the words "Place Order" to complete their purchases.  Ciruolo Decl. (dkt. 13-2) ¶¶ 5, 7.

### C.     The Alarm Monitoring Service

After completing their purchases, both Plaintiffs enrolled in a free trial of SimpliSafe's optional alarm monitoring service. Schlueter-Beckner Decl. ¶¶ 19–22; Babka Decl. ¶ 17.[1] To do so, they each downloaded an app onto their phones and completed a form with their system information. Von Stein Decl. (dkt. 13-3) ¶¶ 2, 10. At one point, the form asked Plaintiffs to submit the phone numbers of primary and secondary contacts. Id. ¶¶ 4–6, 11–12. At the bottom of this page, immediately above the "Next"

---

[1] The parties disagree on exactly how Plaintiffs signed up for the monitoring service. SimpliSafe claims in its reply brief that Plaintiffs signed up "<u>and paid for</u>" the service when purchasing the hardware, but they do not provide any evidentiary support for that assertion. Reply (dkt. 25) at 5.

3

1   button (to move onto the next page of the form) was the following disclosure with a

2   hyperlinked contract in bold, blue text:

> By submitting this number, you represent that you are author-ized to provide this number and agree to **SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts.**

Contact Information Screenshots (dkt. 13-3, Exs. 3–5, 10–11). Despite the name, the blue hyperlink connected to SimpliSafe's entire Terms of Service. Von Stein Decl. ¶ 11. Both Plaintiffs completed the forms. See id. ¶¶ 4–6, 11–12.

Schlueter-Beckner—but not Babka—was presented with a final page at the end of this series of forms in which he had to affirmatively acknowledge his acceptance of SimpliSafe's Terms of Service by typing his name. Id. ¶ 9. The text on that page read:

> Please read SimpliSafe's **Terms of Service** carefully and enter your name below if you accept. By accepting the terms of this agreement, you specifically acknowledge and accept (i) the disclaimer / limitation of liability; (ii) the exclusion of warran-ties; and (iii) the indemnity paragraphs of this agreement.

Terms of Service Assent Screenshot (dkt. 13-3, Ex. 8). Although the page did not expressly mention an arbitration clause, the hyperlinked Terms of Service did include such a clause. See Von Stein Decl. ¶ 9; Schlueter-Beckner Terms of Service ¶ 39. Schlueter-Beckner would have had to have typed his name on this form to use his alarm monitoring service, though he does not recall seeing the form or filling it out. Schlueter-Beckner Decl. ¶¶ 26–27; Von Stein Decl. ¶ 9.

**D.   Procedural History**

Plaintiffs sued SimpliSafe, asserting false-advertising and unfair-business-practices claims. SimpliSafe contends that the arbitration clauses in its Terms of Sale and Terms of Service are binding on Plaintiffs and move to stay the matter pending arbitration.

**II.   LEGAL STANDARD**

The Federal Arbitration Act requires courts to stay any action that is governed by a valid arbitration agreement. 9 U.S.C. § 3. In deciding whether an action is governed by such an agreement, a court must decide two "gateway" issues: (1) whether the agreement to arbitrate exists between the parties and (2) whether the dispute falls within the scope of

4

that agreement. Brennan v. Opus Bank, 796 F.3d 1125, 1130 (9th Cir. 2015) (citing Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)). As to the first question, courts use "general state-law principles" of contract law to determine whether an arbitration agreement between the parties exists. Johnson v. Walmart Inc., 57 F.4th 677, 681–82 (9th Cir. 2023) (citation omitted). Once a court finds an agreement between the parties, it then decides whether the immediate dispute is arbitrable under that agreement, unless the parties "clearly and unmistakably" delegated that threshold question of arbitrability to the arbitrator. Henry Schein, Inc. v. Archer & White Sales, Inc., 586 U.S. 63, 69 (2019) (cleaned up). Under the FAA, courts must send all issues covered by the agreement to arbitration.

## III. DISCUSSION

There are three issues necessary to resolve here. First, the Court must determine whether Schlueter-Becker or Babka formed a contract with SimpliSafe. The Court concludes that Schlueter-Beckner assented to the Terms of Service, but that no other contract is binding. Second, the Court considers whether the Terms of Service agreement is unconscionable. Looking only at the arbitration agreement, the Court concludes it is not. Third, the Court looks to whether Schlueter-Beckner's claims are arbitrable under the Terms of Service. The Court concludes that his Automatic Renewal Law claim is, but the rest are not. Accordingly, the Court denies SimpliSafe's motion except as to Schlueter-Beckner's ARL claim.

### A. Contract Formation at the Point of Sale

Contracts formed online retain the same fundamental requirement of mutual assent as their traditional counterparts under California law; a user must manifest acceptance of contractual terms to be bound by them. Berman v. Freedom Fin. Network, LLC, 30 F.4th 849, 855–56 (9th Cir. 2022). SimpliSafe does not argue that Plaintiffs had actual notice of the contracts' terms, rather it states that assent can be inferred by the websites' disclosure of the contracts. Meaningful assent to an online contract can be inferred only if (1) the website provides "reasonably conspicuous notice" of the contract's terms and (2) the

5

consumer takes some action that "unambiguously manifests his or her assent to those terms." Id. at 856 (citations omitted). Because SimpliSafe's disclosure at the point of sale "explicitly advised" Plaintiffs that placing the order constituted assent, see id. at 857, the key question is whether the disclosure itself was reasonably conspicuous.

Online sellers enjoy complete control over the appearance of their websites, so "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1179 (9th Cir. 2014). A seller must present the contractual terms to the consumer in a reasonably conspicuous manner that "makes it apparent" that an action constitutes assent "to those very terms." Sellers v. JustAnswer LLC, 73 Cal. App. 5th 444, 461 (2021) (cleaned up). To be reasonably conspicuous, the notice must be "displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." Berman, 30 F.4th at 856 (citations omitted). Courts look at two aspects, "considered together," to decide this question: the "visual design of the webpages" and "the context of the transaction." Godun v. JustAnswer LLC, 135 F.4th 699, 709 (9th Cir. 2025) (citations omitted). This means a disclosure's conspicuousness turns on its phrasing, actual size, and placement, subject to the understanding that a reasonable Internet user is "more vigilant" in looking for terms when the transaction's context implies a contractual relationship and less vigilant otherwise. Id.; Sellers, 73 Cal. App. 5th at 461.

The facts of similar cases illustrate these principles. In Berman, for example, the court held that disclosures of terms in small, gray font that was less visually prominent than other elements of a website did not amount to "reasonably conspicuous" notice. 30 F.4th at 858. Like in this case, the defendant only posted its disclosure on the final page of its webform in small, gray text. Id. at 854. The disclosure contained hyperlinks to the contracts, and those links were underlined but otherwise appeared in the same small, gray font as the surrounding sentence. Id. The court called these disclosures the "antithesis of conspicuous" because they were "considerably smaller" than the surrounding website elements and "barely legible to the naked eye." Id. at 856–57. In addition, the presence of

6

hyperlinks was not "readily apparent" because they were identical to their surrounding text but for underlining. Id. at 857.

So too in Godun, where the court held that small, gray, underlined hyperlinks were insufficient for "reasonably conspicuous" notice. 135 F.4th at 711–15. The court characterized the notices in that case as "visually buried" by not being "directly above or below the action button" and "displayed in relatively small text." Godun, 135 F.4th at 711–12; see also Sellers, 73 Cal. App. 5th at 480–81 (reaching the same conclusion where the notice was in "extremely small print" and placed beyond where "the consumer's attention would necessarily be focused"). In Berman, Godun, and Sellers, the courts all found that the lack of reasonably conspicuous notice meant that no contract existed between the parties.

Contrast these examples with instances of reasonably conspicuous notice. In Keebaugh v. Warner Bros. Entertainment Inc., 100 F.4th 1005 (9th Cir. 2024), for example, the court found that a sign-in screen where a notice of terms was printed in a white font on a dark background and was the only text beneath the central "Play" button was reasonably conspicuous. Id. at 1009–12. The "contrasting white font" and singular placement of the notice, unlike the "clutter" in Berman, sufficiently set apart the notice from surrounding elements. Id. at 1020–21. In addition, the context was not an "insular and discrete one-time transaction," but rather a video game that users would play on their phones, and even make purchases in, over time. Id. at 1020; see also B.D. v. Blizzard Ent., Inc., 76 Cal. App. 5th 931, 950–53 (2022) (noting the "continuing, forward-looking relationship" inherent in signing up for a videogame). Thus, reasonably prudent Internet users would have known that they were entering into a continuous relationship and therefore would be more on notice for contractual terms. Keebaugh, 100 F.4th at 1020–21.

Here, no contract was formed with either Plaintiff at the time of sale for two reasons. First, unlike the disclosure in Keebaugh, which was "directly beneath" the "operative button" with design elements making the notice "legible on the dark background," see id. at 1018, 1020 (cleaned up), the placement of SimpliSafe's disclosure

7

1    was located off to the side—not directly above or below the "Place Order" button—and
2    was "displayed in relatively small text," see Point of Sale Screenshot; Godun, 135 F.4th at
3    712.  That SimpliSafe's gray hyperlinks are set off from their surrounding sentence only
4    by underscoring also misses the mark, since "simply underscoring words or phrases … will
5    often be insufficient to alert a reasonably prudent user that a clickable link exists." See
6    Berman, 30 F.4th at 857.  Second, this sale did not inherently contemplate an ongoing
7    relationship between Plaintiffs and SimpliSafe; the transaction was for a one-time sale of
8    hardware and neither Plaintiff intended to create a long-term relationship.  Schlueter-
9    Beckner Decl. ¶¶ 17–18; Babka Decl. ¶¶ 15–16.

10         SimpliSafe contends that Plaintiffs "also added to their cart and paid for monthly
11   alarm system monitoring" at the time of purchase, thereby creating a forward-looking
12   relationship instead.  Reply at 5.  Yet SimpliSafe provides no clear factual support for this
13   assertion.  The declaration to which it cites only indicates Plaintiffs "chose to enroll in
14   alarm service monitoring" without specifying when Plaintiffs enrolled or paid.  Ciruolo
15   Decl. ¶ 2; see id. ¶ 7.  And Plaintiffs' declarations specifically rebut SimpliSafe's
16   contention; they state that Plaintiffs each set up the service approximately two months after
17   purchasing the hardware and that neither even paid, only signing up for a free trial.
18   Schlueter-Beckner Decl. ¶¶ 19–20; see Babka Decl. ¶¶ 17, 21.  Accordingly, the Court
19   cannot credit SimpliSafe's unsubstantiated argument on this point.

20         Because the small, gray disclosure of contractual terms with nondistinct hyperlinks
21   is not reasonably conspicuous, considering the one-time nature of the transaction, the
22   Court concludes that neither Plaintiff assented to a contract at the time of sale.

23        **B.     Contract Formation at the Alarm Monitoring Service Enrollment**
24         Schlueter-Beckner and Babka had slightly different experiences when signing up
25   for the monitoring service on SimpliSafe's app.  Their experiences were materially
26   identical until Schlueter-Beckner encountered a final webform that Babka did not see.  See
27   Von Stein Decl. ¶¶ 9–15.  Accordingly, the Court must separately consider the screens that
28

1   both Plaintiffs saw, which included a reference to SimpliSafe's terms when Plaintiffs

2   entered contact information, and the screen that only Schlueter-Beckner saw.

### 1.     Contact Information Screen (Both Plaintiffs)

During the app enrollment process, Plaintiffs submitted contact information into appropriate webforms. Id. ¶¶ 4–6, 11–12. Above the "Next" button to move on was this notice:

> By submitting this number, you represent that you are authorized to provide this number and agree to **SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts.**

Contact Information Screenshots.

First, SimpliSafe's contact information screen disclosures likely present no issues of inconspicuous placement. As opposed to the purchasing stage, the notice on the app was clearly visible in conspicuous font. See id. But SimpliSafe's phrasing (as opposed to just the placement) of its notice of contractual terms failed to give reasonably conspicuous notice of its arbitration agreement. See Berman, 30 F.4th at 856–57. So Plaintiffs were not bound by SimpliSafe's disclosures at this stage—and because Babka had no further interaction related to SimpliSafe's terms, he is not bound by contractual terms at all.

"Reasonably conspicuous" notice of contractual terms not only must be conspicuously placed, but also conspicuously phrased to communicate the contractual terms to which the seller seeks assent. Sellers, 73 Cal. App. 5th at 461. For example, in Herzog v. Superior Court, 101 Cal. App. 5th 1280 (2024), review denied, No. S285619 (Cal. Aug. 28, 2024), a California court declined to hold that a disclosure of specific terms (such as that the user's personal information and sensitive health information would be collected, used, and shared) gave reasonably conspicuous notice that a website user would agree to the entire Terms of Use. Id. at 1297–304. The court reasoned that the preface specifying certain terms "distracted" the consumer from the full agreement and made the notice "at best only an uncertain reference" to the full terms of use. Id. at 1297, 1301 (citation omitted). And in Sgouros v. TransUnion Corp., 817 F.3d 1029 (7th Cir. 2016), the court similarly refused to enforce an entire contract between the parties where the

9

disclosure implied that checking a box on a webpage merely authorized "TransUnion to obtain [the plaintiff's] personal information," rather than stating that it expressed assent to the entire Service Agreement. Id. at 1035. As the court put it, "no reasonable person would think that hidden" within that acknowledgment "was also the message that the same click constituted acceptance of the Service Agreement" as a whole. Id. (cleaned up).

Here, SimpliSafe's reference to the "SimpliSafe Terms and Consent to Communicate, for Notifications and Alerts" (which, incidentally, do not exist) misleads in the same way. This disclosure appeared exclusively on forms asking for contact information and would thus lead a reasonable consumer to believe he was consenting specifically to terms related to communication, not the entire Terms of Service. Neither Schlueter-Beckner nor Babka understood "Terms and Consent to Communicate, for Notifications and Alerts" to include terms beyond "consent to receive communications, notifications, and alerts from SimpliSafe," see Schlueter-Becker Decl. ¶ 25, Babka Decl. ¶ 20, and neither would a reasonably prudent Internet user. Just as in Sgouros, SimpliSafe "undid whatever notice it might have been furnishing" within its hyperlink by phrasing the purported consent the way it did. See 817 F.3d at 1036; accord Herzog, 101 Cal. App. 5th at 1297–98.

The Court therefore concludes that neither Plaintiff assented to the Terms of Service based on this notification.

### 2. The Final App Screen (Schlueter-Beckner Only)

Schlueter-Beckner was presented with an additional screen requesting his assent to SimpliSafe's Terms of Service, however. This final screen's sole purpose was to notify the user of the applicable Terms of Service. Its disclosure read:

> Please read SimpliSafe's **Terms of Service** carefully and enter your name below if you accept. By accepting the terms of this agreement, you specifically acknowledge and accept (i) the disclaimer / limitation of liability; (ii) the exclusion of warranties; and (iii) the indemnity paragraphs of this agreement.

Terms of Service Assent Screenshot. This notice was reasonably conspicuous as it was the only text on the page, and he unambiguously manifested assent on the mobile app's final

webform by entering his name to "accept" the terms.  See id.

Schlueter-Beckner argues, relying on Herzog, that because the webform highlighted three terms in the notice, it was not reasonably conspicuous notice of the entire Terms of Service.  Opp'n (dkt. 20) at 10–11.  But unlike in Herzog and similar cases, SimpliSafe's webform includes a clear statement and reference to the entire Terms of Service beyond mentioning the specified terms.  Those terms clarify, but do not purport to limit, the scope of the terms that Schlueter-Beckner agreed to.  These clarifications would therefore not mislead a reasonably prudent user from understanding that they were agreeing to the entire Terms of Service.

Accordingly, the Court rejects Schlueter-Beckner's arguments and concludes that SimpliSafe's Terms of Service bind him.  None of the app's disclosures reference the SimpliSafe's Terms of Sale, though, so those still do not apply.

### C.     Unconscionability

Schlueter-Beckner then argues that the entire Terms of Service, including the arbitration provision, is unconscionable and unenforceable.  Under the FAA, courts need only recognize the validity of the arbitration agreement to send the matter to arbitration.  Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S. 63, 70 (2010).  Schlueter-Beckner's claims of unconscionability of the whole contract are thus properly resolved by the arbitrator as long as the arbitration agreement is valid and encompasses the disputes.  Id.

Under California law, an unconscionable agreement must be both procedurally and substantively unconscionable.  Armendariz v. Found. Health Psychcare Servs., Inc., 24 Cal. 4th 83, 114 (2000).  But as a matter of law, a "meaningful opportunity to opt out" of the arbitration provision negates procedural unconscionability.  Cir. City Stores, Inc. v. Ahmed, 283 F.3d 1198, 1199–200 (9th Cir. 2002).  Schlueter-Beckner's Terms of Service contained an opt-out provision, allowing him to have opted out via email within sixty days of executing the contract.  Schlueter-Beckner Terms of Service ¶ 39(d).  This provision means Schlueter-Beckner fails to satisfy the procedural unconscionability requirement.

1    Schlueter-Beckner argues that he did not really have a meaningful opportunity to
2    opt out of arbitration—but not because he was procedurally unable to. Instead, he points
3    to the fact that the alternative to arbitration was a forum-selection clause and jury waiver.
4    Opp'n at 13–14. Though his argument that he is between a rock (arbitration) and a hard
5    place (a different forum with no jury) has some intuitive appeal, Schlueter-Beckner cites
6    no cases where courts have evaluated the alternatives to arbitration and then concluded that
7    a party lacked a meaningful opportunity to opt out of arbitration. See id. Indeed, he
8    identifies no case where a court has even looked at the contractual alternatives to
9    arbitration at all. When considering whether a contract provides a meaningful opportunity
10   to opt out, courts typically look to whether the offeree was procedurally able to opt out.
11   See, e.g., Mohamed v. Uber Techs., Inc., 848 F.3d 1201, 1211 (9th Cir. 2016) (holding a
12   "meaningful opportunity" existed even when an Uber driver would have had to opt out in
13   person in San Francisco or by overnight delivery service, regardless of other terms);
14   Kilgore v. KeyBank, Nat'l Ass'n, 718 F.3d 1052, 1059 (9th Cir. 2013) (en banc) (finding a
15   sixty-day period to opt out of arbitration sufficient); cf. OTO, L.L.C. v. Kho, 8 Cal. 5th
16   111, 126–30 (2019) (finding no "meaningful choice" when the defendant was given only a
17   few minutes to sign complicated legal jargon written in extremely small, single-spaced
18   font). Accordingly, the Court cannot find that Schlueter-Beckner lacked a meaningful
19   opportunity to opt out of arbitration solely because the alternatives may have been onerous.
20   Schlueter-Beckner's further arguments about the unconscionability of the forum
21   selection clause and jury waiver do not help him at this stage because the enforceability of
22   those clauses, as well as any other contract defenses pertaining to other provisions, are not
23   properly resolved at a motion to compel. See Rent-A-Ctr., 561 U.S. at 70. These
24   arguments must be resolved on the merits. On this basis, the Court does not reach the
25   substantive unconscionability question and concludes the arbitration clause is enforceable.
26   Because Schlueter-Beckner's arbitration agreement is "valid, irrevocable, and
27   enforceable," see 9 U.S.C. § 2, any claim it encompasses must be sent to the arbitrator.
28

12

**D.     Arbitrability**

Once a court finds that an agreement to arbitrate is valid and enforceable, it ordinarily then decides whether the particular dispute is governed by the agreement unless the parties' agreement delegates that threshold arbitrability question to the arbitrator by "clear and unmistakable" evidence. Henry Schein, 586 U.S. at 69 (quoting First Options of Chi. v. Kaplan, 514 U.S. 938, 944 (1995)). All submitted SimpliSafe agreements incorporate by reference the AAA's Consumer Arbitration Rules, which delegate the arbitrability question to the arbitrator. The first question then is whether incorporation of the AAA's rule constitutes "clear and unmistakable" delegation between a sophisticated and unsophisticated party. If it does not, then the Court must itself decide whether this dispute is arbitrable under the Terms of Service.

### 1.     Delegation of the Arbitrability Question

SimpliSafe points to Brennan to support its argument that incorporation of the AAA Rules is "clear and unmistakable" delegation. Mot. at 16–17. The Ninth Circuit held in Brennan that "incorporation of the AAA rules constitutes clear and unmistakable evidence that contracting parties agreed to arbitrate arbitrability." 796 F.3d at 1130. But it expressly limited that holding as "between sophisticated parties," leaving open the question whether incorporation of the AAA rules is clear and unmistakable delegation to an unsophisticated party. Id. at 1131; accord Patrick v. Running Warehouse, LLC, 93 F.4th 468, 481 (9th Cir. 2024) (recognizing the same question was still open in 2024). There is currently a split within this district on that question. Compare, e.g., Cordas v. Uber Techs., Inc., 228 F. Supp. 3d 985, 992 (N.D. Cal. 2017) (finding incorporation of arbitration rules effective delegation regardless of the parties' sophistication), Bazine v. Kelly Servs. Glob., LLC, No. 5:22-cv-07170-BLF, 2023 WL 4138252, at *6 (N.D. Cal. June 21, 2023) (same), and Singh v. Payward, Inc., No. 3:23-cv-01435-CRB, 2023 WL 5420943, at *8 (N.D. Cal. Aug. 22, 2023) (same), with Eiess v. USAA Fed. Sav. Bank, 404 F. Supp. 3d 1240, 1253 (N.D. Cal. 2019) (holding incorporation of arbitration rules insufficient in contracts involving at least one unsophisticated party), Hooper v. Jerry Ins.

13

Agency, LLC, 675 F. Supp. 3d 1027, 1039–40 (N.D. Cal. 2023) (same), and Magill v. Wells Fargo Bank, N.A., No. 4:21-cv-01877-YGR, 2021 WL 6199649, at *5 (N.D. Cal. June 25, 2021) (same).

    The Court holds that this context—veiled incorporation of arbitration rules within an already veiled lengthy Terms of Service agreement—does not meet the required clear and unmistakable evidentiary standard as to unsophisticated parties. The "clear and unmistakable" requirement "pertains to the parties' manifestation of intent"—whether the parties' actions clearly imply a desire to delegate the arbitrability question. Rent-A-Ctr., 561 U.S. at 69 n.1. Where the parties "are not likely to have thought that they had agreed" to delegate the question, the court must "avoid[] the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate" by deciding the question on its own. Howsam, 537 U.S. at 83–84. Because this standard relates to the parties' actual manifestation of intent, recognizing the delegation would require the Court to declare a finding that Schlueter-Beckner unmistakably intended to delegate the "rather arcane" arbitrability question, see First Options, 514 U.S. at 945, simply by clicking a button. Such an inference defies common experience.

    To illustrate this point, this inference would assume that Schlueter-Beckner, after having navigated through eight webforms to get a one-month free trial, clicked on the Terms of Service, viewed the lengthy agreement (which spans twenty single-spaced pages when printed out) on his phone, noticed the incorporation of the AAA rules, located and pulled up those rules (which span thirty-seven single-spaced pages), and found the delegation rule therein. Such a scenario is unreasonable for the average consumer with no legal experience. Of course, not reading the terms of a contract is no defense to its enforceability generally, but courts impose a "heightened standard" with respect to this issue. See Rent-A-Ctr., 561 U.S. at 69 n.1. Incorporating dozens of pages of AAA Rules within dozens of pages of SimpliSafe Terms of Service is "tantamount to inserting boilerplate inside of boilerplate," and to call this "clear and unmistakable" evidence of Schlueter-Beckner's intent to delegate the question "would be to take 'a good joke too

14

far.'" Allstate Ins. Co. v. Toll Bros., Inc., 171 F. Supp. 3d 417, 429 (E.D. Pa. 2016) (quoting Campbell Soup Co. v. Wentz, 172 F.2d 80, 83 (3d Cir. 1948)).[2]

Because this delegation question requires a heightened showing under the Supreme Court's interpretation of the FAA, mere incorporation of the AAA Rules in dense Terms of Service cannot suffice for an unsophisticated party like Schlueter-Beckner.

### 2. Arbitrability of the Dispute

The parties did not clearly and unmistakably delegate the arbitrability question, so the Court must decide that on its own. Plaintiffs primarily allege that SimpliSafe engaged in false advertising at the time of sale, invoking a California statute relating to misleading discount-related advertisements for the sale of SimpliSafe's goods. Compl. ¶¶ 143–200. Plaintiffs also allege violation of California's Automatic Renewal Law. Id. ¶¶ 128–34.

SimpliSafe's Terms of Service require arbitration for "any dispute or disagreement between the parties arising from or relating to this Agreement or the breach hereof," explicitly including without limitation "auto renewal disputes, billing, or service disputes." Schlueter-Beckner Terms of Service ¶ 39 (cleaned up). Schlueter-Beckner's ARL claim is clearly arbitrable under this language.

Schlueter-Beckner's remaining claims do not fall under the Terms of Service, however. The claims pertain to improper advertisement for the hardware sale, regardless

---

[2] District courts that have come out the other way have done so largely to avoid the "impractical line-drawing" necessary to discern sufficient sophistication. See, e.g., Singh, 2023 WL 5420943, at *8. It is not clear, however, that this approach adequately applies the Supreme Court's "heightened standard." See First Options, 514 U.S. at 945 (citation omitted). Contracts involving unsophisticated parties are the paradigmatic example of the Court's concern of how delegation of certain questions to an arbitrator could dramatically increase arbitrators' power. If anyone is going to be "too often force[d] … to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide," it is an unsophisticated party. See id.; see also Beco v. Fast Auto Loans, Inc., 86 Cal. App. 5th 292, 302–06 (2022) (reaching the same conclusion based on California state court precedent interpreting First Options). Plus, courts are adequately equipped to evaluate parties' sophistication, as they do so in many other areas of contract law. See, e.g., Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co., 819 F.2d 1519, 1527 (9th Cir. 1987) (citation omitted) (unconscionability); Foster v. Chesapeake Ins. Co., 933 F.2d 1207, 1219 (3d Cir. 1991) (citation omitted) (fraud and undue influence); RIV VIL, Inc. v. Tucker, 979 F. Supp. 645, 655–66 (N.D. Ill. 1997) (duress); Harris Corp. v. Giesting & Assocs., Inc., 297 F.3d 1270, 1273 (11th Cir. 2002) (interpretation of potentially ambiguous terms).

15

of whether Schlueter-Beckner enrolled in the monitoring service. The arbitration agreement regarding SimpliSafe's monitoring service does not encompass the false-advertising dispute regarding the separate, and earlier in time, sale of its products.

SimpliSafe correctly points out that the FAA represents a "liberal federal policy favoring arbitration." Mot. at 11 (quoting AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011)). But "while ambiguities in the language of the agreement should be resolved in favor of arbitration," courts must not "reach a result inconsistent with the plain text of the contract[] simply because the policy favoring arbitration is implicated." EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002) (cleaned up). Arbitration agreements must be "on an equal footing with other contracts" and receive the same judicial scrutiny. Concepcion, 563 U.S. at 339 (citation omitted). Accordingly, normal state-law principles of contract interpretation govern the arbitration clause. First Options, 514 U.S. at 944 (citations omitted).

Though the Terms of Service employ "broad and far reaching" language, see Chiron Corp. v. Ortho Diagnostic Sys., Inc., 207 F.3d 1126, 1131 (9th Cir. 2000), disputes "arising from or relating to" the Terms still have an outer bound. See AGCO Corp. v. Anglin, 216 F.3d 589, 593 (7th Cir. 2000) (holding that even broadly phrased arbitration agreements "must not be so broadly construed as to encompass claims that were not intended to be arbitrated under the original contract"). Schlueter-Beckner's non-ARL claims pertain only to the advertisement and sale of SimpliSafe's hardware; they have nothing to do with the ancillary alarm monitoring service and its corresponding Terms.

Courts considering similar facts have reached the same conclusion. For example, in Close v. Penney OpCo LLC, No. 3:24-cv-05756-DGE, 2025 WL 1721002 (W.D. Wash. June 20, 2025), appeal docketed, No. 25-4181 (9th Cir. July 7, 2025), a plaintiff alleged a similar false advertising scheme against JCPenney for deceptive pricing. Id. at *1. JCPenney moved for arbitration because the plaintiff was a rewards member and assented to an arbitration agreement as a part of that membership. Id. The agreement's language, like here, encompassed any disputes that "arose out of" or "related in any way" to the

16

rewards membership. Id. at *3 (cleaned up). Because deceptive-pricing and false-advertising allegations had nothing to do with the plaintiff's reward membership, the court held that this language would not cover the plaintiff's claims. Id. at *4. As another court explained, "with respect to the alleged wrong, it [was] simply fortuitous that the parties happened to have a contractual relationship." Cavlovic v. J.C. Penney Corp., 884 F.3d 1051, 1060 (10th Cir. 2018) (citation omitted) (holding that JCPenney's rewards program arbitration agreement did not encompass a purchase-related dispute).

The same result follows here. The Terms of Sale do not apply, and the Court concludes that Schlueter-Beckner's claims (except for the Automatic Renewal Law claim) are not arbitrable.

### 3. Stay of Arbitrable and Nonarbitrable Claims

Part of this litigation is arbitrable and part is not. The FAA requires the Court to stay litigation as to the arbitrable claim. See Smith v. Spizzirri, 601 U.S. 472, 475–76 (2024). But "where some, but not all, claims are subject to arbitration, it is within a district court's discretion whether to stay or proceed with the litigation on the non-arbitrable claims." Ireland-Gordy v. Tile, Inc., 760 F. Supp. 3d 946, 964 (N.D. Cal. 2024) (cleaned up), appeal docketed, No. 25-403 (9th Cir. Jan. 21, 2025). A district court's discretion should be informed by "economy and efficiency, the similarity of the issues of law and fact to those that will be considered during arbitration, and the potential for inconsistent findings absent a stay." Wolf v. Langemeier, No. 2:09-cv-03086-GEB-EFB, 2010 WL 3341823, at *8 (E.D. Cal. 2010) (citation omitted). These factors usually point to a stay when "the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision." Cal. Crane Sch., Inc. v. Google LLC, 621 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022) (citation omitted).

Here, the arbitrable ARL claim is ancillary both in substance and importance to the overall complaint. All of Babka's claims and all but one of Schlueter-Beckner's claims are nonarbitrable, and none of them depends on the outcome of the ARL claim. The Court will therefore proceed with those claims, staying only Schlueter-Beckner's Automatic

Renewal Law claim.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS SimpliSafe's motion with respect to Schlueter-Beckner's ARL claim and DENIES the motion with respect to Babka and Schlueter-Beckner's other claims. The Court will proceed on all counts except for Schlueter-Beckner's ARL claim.

**IT IS SO ORDERED.**

Dated: July 30, 2025



CHARLES R. BREYER
United States District Judge